UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BENNY T. WARR and NINA M. WARR,

                         Plaintiffs,

    vs.

ANTHONY R. LIBERATORE,
JOSEPH M. FERRIGNO, II,
MITCHELL R. STEWART, II,
JAMES M. SHEPPARD and
CITY OF ROCHESTER,
                      Defendants.

**MEMORANDUM OF LAW**
**13-CV-6508-EAW-MWP**

---

      Plaintiffs Benny T. Warr and Nina M. Warr (hereinafter "Plaintiffs"), by their attorneys, Burkwit Law Firm, PLLC, submits this Memorandum of Law in opposition to Defendants' Motion For Summary Judgment pursuant to FRCP Rule 56. In their Complaint (Exhibit A – Defendants Statement of Undisputed Facts), Plaintiffs have alleged causes of action for: 1) Violation of 42 USC Section 1983 by Defendants Liberatore, Ferrigno, Stewart and City of Rochester For Illegal Search and Seizure of Plaintiff Benny T. Warr's Person; 2) Violation of 42 USC Section 1983 by Defendants Liberatore, Ferrigno, Stewart and City of Rochester For Use of Excessive Force against Plaintiff Benny T. Warr's Person; 3) Violation of 42 USC Section 1983 (Conspiracy To Violate) By Defendants Ferrigno, Liberatore and Stewart; 4) Violation of 42 USC Section 1983 By Defendant City of Rochester (Failure To Implement Policies, Customs and Practices); 5) Violation of 42 USC Section 1983 By Defendants City of Rochester and

James Sheppard (Supervisory Liability/<u>Monell v. Dept. of Social Services</u>, 436 US 658 (1978)) and Declaratory and Injunctive Relief; 6) Battery by Defendants Liberatore, Ferrigno, Stewart and City of Rochester; 7) Assault by Defendants Liberatore, Ferrigno, Stewart and City of Rochester; 8) Intentional Infliction of Emotional Distress by Defendants Liberatore, Ferrigno, Stewart and City of Rochester; 9) Negligent Infliction of Emotional Distress by Defendants Liberatore, Ferrigno, Stewart and City of Rochester; 10) Negligence Against All Defendants; and 11) Loss of Consortium Against All Defendants. Upon reviewing the allegations set forth in Plaintiff's Complaint and upon review of the testimony of witnesses, the video and documentary evidence presented on this motion, Defendants' motion for Summary Judgment should be denied in its entirety.

## THE FACTS

Plaintiff Benny Warr (hereinafter "Warr") is a one leg amputee who utilizes an electric power wheelchair for traveling distances. On May 1, 2013, Warr resided two (2) blocks away from the intersection of Jefferson Avenue and Bartlett Street in Rochester, New York. During the afternoon and evening of May 1, 2013 Warr was present at or near this particular intersection socializing with friends and neighbors and acting in a lawful manner. During the evening of May 1, 2013, Warr went to Royals Food Market where he purchased ice cream. The Blue Light Camera (**Exhibit G** – Burkwit Answering Affidavit) shows that at 8:02:34 p.m., Warr backed his wheelchair against the Swan Bridge building (hereinafter "The Swan") at 584 Jefferson Avenue where he congregated with Derrick Latham(hereinafter "Latham") who is a friend of Warr's

nephew and one other person. At 8:04:50 p.m., the Blue Light Camera shows Warr was sitting in his wheelchair in front of The Swan eating his ice cream in the presence of Latham, who is sitting on a step or sidewalk to the right of Warr. The Blue Light camera shows that at 8:05:03 p.m., a group of approximately five (5) men leave the front of Zack Mini Mart at 580 Jefferson Avenue and begin walking southbound across Whittlesey Street on the east sidewalk toward Warr and Latham. The Blue Light camera shows that at 8:05:07 p.m., Defendants Ferrigno and Liberatore are driving a Rochester Police Department (hereinafter "RPD") vehicle northbound on Jefferson Avenue and passing The Swan where Warr is seated in his wheelchair and eating his ice cream. The brake lights are activated on the police car as it drives past Warr and Latham. At this time, the group of five (5) men stop at the southeast corner of Whittlesey Street and Jefferson Avenue as the police car passes. The Blue Light Camera shows that at 8:05:13 p.m., Latham stands up in front of The Swan entrance to the right of Warr who is still eating his ice cream. The Blue Light camera then pans away from this location. Only one minute and 13 seconds later at 8:06:20 p.m., the Blue Light camera shows Warr has left and crossed over to the west side of Jefferson Avenue in his wheelchair stopped at the driveway entrance of Warrens Pharmacy near the bus stop with his ice cream in hand. Warr is next shown on Blue Light Camera at 8:08:41 p.m. sitting in his wheelchair at the bus stop in the presence of Tache Young and Latham. At 8:08:53 p.m., Defendants Ferrigno and Liberatore are seen on Blue Light camera in front of a building at 581 Jefferson Avenue congregating with approximately six (6) males on the west sidewalk area in front of this building. At 8:09:20 p.m., the Blue Light camera shows that the area of Zack Mini Mart at 580 Jefferson Avenue remains clear with

nobody congregating in this area. At 8:10:56 p.m., the Blue Light camera shows Warr

eating his ice cream at the bus stop with Tache Young and Latham. At 8:10:59 p.m., the

Blue Light camera shows Defendant Ferrigno on the west sidewalk leaving the front of

the building at 581 Jefferson Avenue and stepping off the curb to head eastbound to

cross Jefferson Avenue. At 8:11:18 p.m., the Blue Light camera shows Defendant

Liberatore's head and upper body as he walks eastbound in front of a parked maroon

SUV along the west curb on Jefferson Avenue. Defendant Ferrigno stops and then

stands facing southbound in front of the SUV. At 8:11:32 p.m., the Blue Light camera

shows Defendant Liberatore crossing Jefferson Avenue in an eastbound direction. At

8:11:35, the Blue Light camera shows Defendant Ferrigno stepping off the east

sidewalk into the east curb lane to greet Defendant Liberatore who is in the northbound

lane on Jefferson Avenue crossing eastward. From 8:11:43 p.m. to 8:12:00 p.m., the

Blue Light camera shows Defendants Liberatore and Ferrigno on the east side of

Jefferson Avenue in front of The Swan at 584 Jefferson Avenue. As the officers stand

there, no people are congregating around them except one man in a white t-shirt who

walks towards the officers. At 8:13:13 p.m., the Blue Light camera shows Plaintiff Warr

sitting in his wheelchair at the bus stop with Tache Young, Latham and one other

person. At 8:13:53 p.m., the Blue Light camera shows Defendants Ferrigno and

Liberatore standing on the east sidewalk near the curb in front of The Swan. At 8:14:04

p.m., the Blue Light camera shows both Defendants Liberatore and Ferrigno walking

slowly in a westbound direction across Jefferson Avenue. At 8:14:10 p.m., the Blue

Light camera shows Defendant Liberatore's head as he is walking in the southbound

lane crossing Jefferson Avenue. At 8:14:20, the Blue Light camera shows that nobody is

congregating on the east sidewalk on Jefferson Avenue. At 8:15:18 p.m., the Blue Light camera shows Warr's wheelchair laying on the sidewalk as Defendants Liberatore and Ferrigno arrest Warr. At this time, Mary Adams' white vehicle is seen pulling into the Warrens Pharmacy driveway entrance. At 8:15:26, the Blue Light camera shows Defendant Liberatore looking in both directions before delivering an elbow strike (8:15:29 p.m.) to Warr's head as he is laying on the sidewalk. At 8:15:34 p.m., the Blue Light camera shows Defendant Ferrigno delivering abdominal strikes to Warr using his right knee as Defendant Stewart arrives on scene. The video shows the Defendant Officers continue arresting Warr. At 8:16:34 p.m., the Blue Light camera shows Defendant Liberatore moving towards onlookers and gestures them to move away. At 8:17:19 p.m., the Blue Light camera shows Defendant Liberatore forcing onlookers to disperse as Warr lays on the sidewalk. At 8:42:26 p.m., after laying on the sidewalk handcuffed for over 25 minutes, Warr is finally lifted onto a stretcher by Rochester Police officers and placed in an ambulance.

From the Blue Light camera footage, Warr never congregated with a large group and he promptly left The Swan on the east side of Jefferson Avenue and went to the bus stop on the west side of Jefferson Avenue when the Defendant Officers arrived and pulled up in front of Zack Mini Mart at 580 Jefferson Avenue. The Blue Light camera video does not show any large groups forming or any conduct which would remotely resemble "disorderly conduct" on the part of Warr, who remained at the bus stop with Tache Young and Latham for more than nine (9) minutes before the Defendant Officers decide to approach him, mace him, push his wheelchair over, assault and arrest him.

The facts show that Warr never used profanity towards the Defendant Officers, who never appeared alarmed on video, never provoked them to attack him and did not engage in disorderly conduct as defined by Penal Law §240.20.

Following Warr's arrest, the Defendant Officers fabricated charges against Warr to justify their excessive use of force against him, his arrest and their own exonerations. The following are glaring problems, false facts and inconsistencies which the RPD failed to acknowledge, address and bring to the Civilian Review Board's attention:

a) The 911 dispatch call made by the Defendant Officers was at 8:14:31 p.m. reported suspicious activity at Bartlett Street/Jefferson Avenue (see Exhibit F – Defendants' Statement of Undisputed Facts). But Defendant Liberatore testified that the call was made for two individuals loitering across the street at 580 Jefferson Avenue. (Exhibit B – Liberatore Dep., pg. 43, line 2 to pg. 44, line 9). Warr was on the other side of the street at the bus stop when this call was made;

b) The RPD Incident Report (Exhibit I – Defendants' Statement of Undisputed Facts) falsely identifies Warr as "Benny Webb, an Associate of Chalk'Em South gang". Benny Webb is an actual person who has felony convictions for criminal sale of a controlled substance and Robbery 2nd as evidenced on the New York State Department of Corrections website. The RPD never addressed Warr's false identification as a gang member by the Defendant Officers, never raised it in the PSS Investigative Summary or during Civilian Review Board review;

c) The Defendant Officers both acknowledged that they did not know Warr at the time of his arrest so their identification of Warr as a known gang member and their "prior intel" of this fact is false. The PSS Investigative Summary falsely states that the Defendant Officers had "prior intelligence on Warr regarding his association with gang members, possibly being involved in a drug sale and accessibility to weapons" (See Exhibit V – Defendants' Statement of Undisputed Facts, pg. 9 of 11). The RPD PSS Investigative Summary falsely claims Defendant Ferrigno knew Warr as an Associate of the Chalk'Em South gang as Defendant Ferrigno admitted he did not know Warr prior to his arrest. This deliberate misidentification of Warr as a gang member was placed by RPD in the PSS Investigative Summary which was presented and considered by the Civilian Review Board;

6

d) Defendant Ferrigno gave a statement to the Professional Standards Section that Warr was part of the large group that was "shooting dice, playing chess and drinking" (See Exhibit V – Defendants' Statement of Undiputed Facts, pg. 3 of 11). But Defendant Ferrigno denied seeing any of this activity when he testified at his deposition. (Exhibit A – Burkwit Answering Affidavit, Ferrigno Dep., pg. 86, line 4 to Pg. 87, line 11);

e) Defendant Liberatore stated during the PSS investigation that when he went to 580 Jefferson Avenue, "they began to disperse about ten to twelve individuals who were congregating in front of the establishment, with Warr being one of those individuals". (See Exhibit V – Defendants' Statement of Undisputed Facts, pg. 3 of 11). The Blue Light Camera video does not show a group of ten to twelve individuals and does not show Warr in front of 580 Jefferson Avenue;

f) The PSS Investigative Summary references that there was a "large crowd forming" and "several individuals approaching them" which the Blue Light Camera video does not show this;

g) Defendant Ferrigno claims in the PSS investigative Summary that Warr "threw a punch at Officer Ferrigno hitting him in the groin" was "swinging his fists" and "continued to resist by trying to hit the officers with his fists", actions which are not seen on either Blue Light Camera video, cell phone video or confirmed by any of the witnesses;

h) The Incident Report and Narratives of Defendants Ferrigno, Liberatore and Stewart (Exhibits I and L – Defendants' Statement of Undisputed Facts) initially allege that Warr engaged in disorderly conduct by yelling profanities at the Defendant Officers at 595 Jefferson Avenue where the bus stop is located. The Defendant Officers and RPD later change the location and later claim in the PSS Investigative Summary that Warr engaged in disorderly conduct across the street at 580 Jefferson Avenue and that Warr "took off in his wheelchair westbound across Jefferson Avenue, to the area of 595 Jefferson Avenue". (See PSS Investigative Summary – Exhibit V- Defendants' Statement of Undisputed Facts).  The RPD PSS Investigative Summary claims a new allegation that Warr "took off in his wheelchair" which was absent from the initial Incident Report and Narratives of the Defendant Officers (Exhibits I and L – Defendants' Statement of Undisputed Facts). Upon considering that Warr promptly left and crossed the street upon the initial arrival of the Defendant Officers and upon considering that Warr was peacefully sitting in his wheelchair at the bus stop and was not even approached by the Defendant Officers until more than nine (9) minutes later, there is no evidence that the alleged disorderly conduct ever occurred;

Based on the foregoing, the Defendant Officers falsified their "prior intel" about Warr after he was arrested, created inconsistent and conflicting stories about Warr engaging in disorderly conduct which is not supported by the Blue Light Camera video, cell phone video or witness accountings. Although Defendants try to portray Warr as a one leg amputee with a gang related criminal history who asked for a beating, they cannot escape the video evidence which shows Warr peacefully assembling with Tache Young and Latham while enjoying his ice cream before he is violently pushed over in his wheel chair and brutally beaten by the Defendant Officers.

## SUMMARY JUDGMENT SHOULD BE DENIED

Pursuant to Bryant v. Maffucci, 923 F2d 979 (2nd Cir. 1991), the Defendants have failed to meet their initial burden of proof demonstrating the absence of a genuine issue of material fact to warrant granting summary judgment in their favor and the foregoing factual issues can only be resolved at trial. Pursuant to Anderson v. Liberty Lobby, Inc., 477 US 242, 248 (1986), the dispute regarding the material facts of this case is genuine since the evidence is such that a reasonable jury could return a verdict in the Plaintiff's favor.

## THE VIDEO EVIDENCE

Although the video footage submitted in opposition to Defendants' motion for summary judgment may be utilized to resolve factual issues in this case, the video footage did not catch all of the actions of the Defendant Officers. The facts before this Court show that as Defendant Stewart exited his police vehicle and approached Warr, there are witnesses who indicate Warr was kicked by him. Latham testified during his deposition that he saw Warr kicked in the back and his head. Mary Adams saw punches

and a particularly brutal kick to Warr's head by the police, probably the officer who pulled up in the police car. Plaintiff's expert Michael Levine concluded that the view of this possible kick was blocked on the video due to Defendant Ferrigno's body and the wheelchair. In the cell phone video footage taken by Tache Young, you can hear her say "Why are you kicking him?" right when Defendant Stewart approached Warr on the sidewalk. Although the video evidence in this particular case is substantial, there were some actions which were observed by the independent witnesses but not captured on video. The video evidence made it clear that the onlookers kept their distance from the Defendant Officers and that they did not interfere with the arrest of and assault on Warr. Based on the video footage before this Court, it is clear that unlawful excessive and deadly force was used on Warr and that the video footage does not support the preposterous story which the Defendants created post arrest in their sworn official statements.

## WARR WAS FALSELY ARRESTED, UNLAWFULLY SEARCHED AND SEIZED

Based on the foregoing compelling evidence in this case, the Defendant Officers did not have probable cause to arrest Warr. Pursuant to People v. Baker, 20 NY3d 354 (2013), where a defendant makes abusive and profane statements to a police officer which are not accompanied by menacing conduct and where there is no basis to infer the officer felt threatened by the statements, such proof is insufficient to support the public harm element for disorderly conduct. The Court of Appeals in People v. Baker also noted the fact that since another police officer was present, this diluted the risk that others in the vicinity would join forces with defendant and gang up on the arresting officer. Also, in People v. Baker, there was no evidence that the bystanders expressed

any inclination, verbally or otherwise, to involve themselves in the dispute between the defendant and the officer.

Even if Warr did make abusive comments to the Defendant Officers, the video evidence before this Court shows that the Defendant Officers were not threatened when they initially arrived and as they walked back and forth across Jefferson Avenue for over nine (9) minutes congregating with other people on the sidewalk while Warr remained at the bus stop. There is a complete lack of "menacing conduct" on the part of Warr which is required to support the public harm element for disorderly conduct. Similar to People v. Baker, Defendants Ferrigno and Liberatore were together at all times which diluted the risk that others in the vicinity would "join forces with the defendant and gang up on the arresting officer". In fact, within seconds after Defendant Liberatore delivers the elbow strike to Warr, the Blue Light camera video shows a third officer, Defendant Stewart, arriving within seconds at the scene in a police vehicle. The video evidence shows the Defendant Officers were never at any risk of injury before, during and after the time Warr was beaten and apprehended. Warr never "created a public threat to Defendants Ferrigno and Liberatore" as the "credible" evidence clearly shows. The evidence before this Court also does not show that the bystanders expressed any inclination, verbally or otherwise, to involve themselves in the apprehension of Warr but rather kept their distance at all times so as to not interfere. Based on the foregoing, the Defendant Officers did not have probable cause to arrest, search and seize Warr. The Defendant Officers did not know Warr or his history when they approached and arrested him and therefore, Defendants argument that they had "ample basis to issue a dispersal order" is unfounded. Warr was not engaged in suspicious and evasive behavior like a

drug dealer since he was just sitting in his wheelchair eating ice cream in the presence

of the Defendant Officers as shown on Blue Light camera video. Since the Defendant

Officers knew nothing about Warr prior to their encounter with him, the Blue Light

Camera footage prior to Warr's arrest is irrelevant and should not be considered by this

Court. Defendants' counsel's narrative of what Mr. Warr's pre-arrest activities show on

Blue Light camera is creative story telling at best. This pre-arrest activity shown on Blue

Light camera could not and did not form the probable cause for the Defendant Officers'

arrest of Warr on May 1, 2013 since they were unaware of what Warr's activities were

prior to arriving on scene at 580 Jefferson Avenue at 8:05:07 p.m. Based on the

foregoing, the Defendant Officers falsely arrested and unlawfully searched and seized

Warr since they clearly lacked probable cause to believe that any crime had been

committed by Warr prior to his arrest on May 1, 2013.

## EXCESSIVE FORCE WAS USED AGAINST WARR

The Fourth Amendment, which guarantees US citizens the "right to be secure in

their persons...against unreasonable searches and seizures", protects citizens from the

"unreasonable" use of force during the course of an arrest. Lehal v. United States of

America, 2015 US Dist. Lexis 173610 at 20, citing Graham v. Connor, 490 US 386, 395-

96 (1989). Police officers' application of force is excessive, in violation of the Fourth

Amendment, if it is "objectively unreasonable in light of the facts and circumstances

confronting them, without regard to the officers' underlying intent or motivation". Id. at

20-21, citing Papineau v. Parmley, 465 F3d 46, 61 (2nd Cir. 2006).

Defendant Officers use of force against Warr was clearly unreasonable. Although

the Defendant Officers never received training on how to arrest a person in a

wheelchair, Defendant Ferrigno admits he had the ability to call for a prisoner-transport van. One must ask why a prisoner-transport van wasn't called in the case of Warr. Instead, the Defendant Officers maced Warr, pushed his wheelchair over causing his body and head to slam onto the sidewalk and they proceeded to assault him with abdominal knee strikes, an elbow strike to the head a brutal kick and other force. Plaintiff Warr broke three (3) ribs in the process of being assaulted and he is left with permanent and disabling injuries. Plaintiff's police/force expert Michael Levine noted in his affidavit that it appears Defendant Ferrigno administered a closed fist punch to Warr only one second before his wheelchair was pushed over, Defendant Ferringo put his knee on Warr's head, a pressure point tactic was utilized on Warr and the force used was both unjustified and excessive by any legitimate law enforcement purpose and significantly in excess of any measure of reasonableness. He also opined that the Defendant Officers resorted to the use of deadly force against Warr and as shown in the video and documentary evidence. Based on the foregoing, the force used against Warr, a one leg amputee in a wheelchair, was clearly excessive and the Defendant Officers had alternative means of taking Warr into custody without resorting to any force (ie. call a prisoner-transport van).

## INTENTIONAL TORT AND NEGLIGENCE CLAIMS ARE PROPER

A cause of action for either intentional or negligent infliction of emotional distress must allege that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Kenny v. Nassau University Medical Center, et al., 2016 US Dist. Lexis 16544 at 36 (EDNY 2016). The video evidence

in this case fits this definition. In order to state a claim for negligent infliction of emotional distress under a "direct liability" theory, plaintiff must show that he/she suffers from emotional injury from defendant's breach of a duty which unreasonably endangered his/her own physical safety. Id. at 35-36, citing <u>Mortise v. United States</u>, 102 F3d 693, 693 (2nd Cir. 1996).

 The Defendant officers undertook the arrest of Warr, a disabled person confined to a wheelchair which the Defendant Officers had no experience or training with such arrest. It is respectfully submitted that by macing Warr, by pushing his wheelchair over and then assaulting him using extreme, unnecessary, excessive and deadly force is extreme and outrageous conduct that transcends the bounds of human decency. Warr suffers from post-traumatic stress disorder due to this event. For these reasons and upon considering the proof before this Court, the alternatively pled intentional tort and negligence claims should not be dismissed. In the event Warr's federal based claims are dismissed, at least Plaintiff's state law claims would remain for the jury's consideration. Since it is unknown whether a jury will find liability against each defendant under the federal claims and/or state law claims and whether their conduct will be determined as negligent and/or intentional. Accordingly, these claims should not be dismissed.

## <u>CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. §1983</u>

 Warr has alleged a conspiracy to violate claim under 42 USC §1983, not 42 USC 1985 (3). To state a claim under 42 USC §1983, a plaintiff must allege (1) an agreement between two or more State actors or between a State actor and a private entity; (2) to

act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. Sharp v. Town of Greece, et al. at 21, citing Pangburn v. Culbertson, 200 F3d 65, 72 (2nd Cir. 1999). Where the alleged conspirators all consist of employees, officers, or agents of a corporation, the "intracorporate conspiracy" doctrine bars such claims. Id. at 21, citing Perrin v. Canandaigua City School District, 2008 US Dist. Lexis 95280 at 2 (WDNY 2008), citing Hartline v. Gallo, 2006 US Dist. Lexis 75849 at 9 (EDNY 2006), affd. in pertinent part, 546 F3d 95 (2nd Cir. 2008). **An exception to this doctrine exists where the intracorporate actors allegedly have motives independent from the corporation**. Id. at 21 (Emphasis Added).

From the compelling factual and video evidence before this Court, the Defendant Officers' conduct was willful, malicious, oppressive and/or reckless. Upon considering that Warr was maced, pushed over in his wheelchair and brutally beaten, it is implied that the Defendant officers had "motive independent from the corporation". Accordingly, the Defendant Officers' malicious conduct should not be shielded by the "intracorporate conspiracy" doctrine since it is plausible that the City of Rochester will argue that it did not have the same motive as the Defendant officers when they conspired to brutally assault Warr.

The video and documentary evidence before this Court certainly raises a material question of fact as to whether the Defendant Officers conspired to violate Warr's civil rights. From watching Defendants Ferrigno and Liberatore lurking on Blue Light Camera video walking back and forth across the street, scoping out the area and watching them target and walk towards Warr at 8:14:04 p.m., a conspiracy is evident. The dispatch call

was made at 8:14:31 p.m. and Warr is shown out of his wheelchair at 8:15:18 p.m. just 47 seconds later. Defendants Ferrigno and Liberatore clearly had planned Warr's assault which was immediate and required additional help by calling Defendant Stewart. The evidence shows that the Defendant Officers had a plan and rapidly executed it. The conspiracy to violate Warr's civil rights is clear and this claim should not be dismissed.

## QUALIFIED IMMUNITY CANNOT BE GRANTED DUE TO NUMEROUS UNRESOLVED ISSUES OF FACT

The defense of qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Kerman v. City of New York, 374 F3d 93, 108 (2nd Cir. 2004); citing Harlow v. Fitzgerald, 457 US 800, 818 (1982). A right is sufficiently established if "it would be clear to a reasonable officer that his conduct was unlawful on the situation he confronted". Id. at 108, citing Saucier v. Katz, 533 US 194 (2001). As a general rule, police officers are entitled to qualified immunity if their conduct does not violate clearly established constitutional rights or it was objectively reasonable for them to believe their acts did not violate those rights. Id. at 108; citing Oliveira v. Mayer, 23 F3d 642, 648 (2nd Cir. 1994). The matter of whether a right was clearly established at the pertinent time is a question of law. Id. at 108. Though immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required. Id at.109, citing Oliveira at 649. After receiving the jury's decision as to what facts were that the officer faced or perceived, the court then may make the ultimate legal determination of whether

qualified immunity attaches on those facts. Id. at 109, citing <u>Stephenson v. Doe</u>, 332 F3d 68, 81 (2nd Cir. 2003). When there are genuine disputed facts that are material to the qualified immunity defense, the factual questions must be decided by the jury, and the court makes the ultimate legal determination whether, based on the facts decided by the jury, the defendant violated clearly established law. <u>Kerman</u> at 111.

Based on the foregoing case authorities, there are numerous issues of fact which make the Court's consideration of Defendants' qualified immunity defense premature and improper since the jury will have to decide the underlying facts the Defendant Officers faced or perceived. In any event, based on the evidence before this Court, it is respectfully submitted that no reasonable officer could believe Defendants' actions were lawful in this particular case. It is not objectively reasonable for the Defendant Officers to believe their actions did not violate Warr's rights. Their conduct was not objectively reasonable since at the time of Warr's arrest, they did not know Warr, his prior arrest record, the "gang affiliation" intel or what Warr was even doing that day prior to his arrest. The Defendant Officers did not give "a lawful order to disperse" to Warr as he waited at the bus stop and they did not have probable cause to mace him, push his wheelchair over, brutally assault and arrest him. The Defendant Officers' exonerations were a farce resulting from false, misleading and/or inaccurate information adopted by the RPD and PSS and then spoon fed to the CRB for their review and approval.

## MUNICIPAL/SUPERVISORY LIABILITY PURSUANT TO 42 USC §1983

### *Municipal Liability*

To prevail on a claim against a municipality under Section 1983 based on the

acts of a public official, a plaintiff is required to prove: 1) actions taken under color of law; 2) deprivation of a constitutional or statutory right; 3) causation; 4) damages; and 5) that an official policy of the municipality caused the constitutional injury. White v. The City of New York, 2015 US Dist. Lexis 100772 at 14 (SDNY 2015), citing Roe v. Waterbury, 542 F3d 31, 36 (2nd Cir. 2008). To state a §1983 claim against a municipality, a plaintiff must adequately allege that a deprivation of his constitutional rights was caused by an official policy or custom of that municipality. Urbina v. City of New York, 2016 US Dist. Lexis 1439 at 10 (SDNY 2016), citing Jeffes v. Barnes, 208 F3d 49, 57 (2nd Cir. 2000), citing Monell v. Department of Social Services of New York, 436 US 658, 692-94 (1978). A plaintiff may satisfy the "policy or custom" requirement in one of several ways, including by alleging the existence of 1) a formal policy officially endorsed by the municipality; 2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; 3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or 4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. White v. City of New York, supra at 15, citing Brandon v. City of New York, 205 F.Supp2d 261, 276-77 (SDNY 2010). To satisfy the fourth prong, the plaintiff must "show that the need for more or better supervision to protect against constitutional violations was obvious", which may be established "by showing that there were repeated complaints of civil rights violations", and "deliberate indifference may be inferred if the complaints are followed by

no meaningful attempt on the part of the municipality to investigate or to forestall further incidents". White v. City of New York, supra at 15, citing Tieman v. City of Newburgh, 2015 US Dist. Lexis 38703, 2015 WL 1379652 at 19 (SDNY 2015) and Jett v. Dallas Independent School District, 491 US 701, 737 (1989)(noting municipal liability may attach where policy maker acquiesces in long-standing practice that constitutes "standard operating procedure" of local government), citing Reynolds v. Giuliani, 506 F3d 183, 192 (2nd Cir. 2007).

Under Monell, a municipality may be liable for deprivation of constitutional rights "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury". Kastle v. The Town of Kent, 2014 US Dist. Lexis 56125 at 35 (SDNY 2014), citing Monell, supra at 694. A municipality may also be liable for inadequate training, supervision, or hiring when the failure to train, hire or supervise amounts to a deliberate indifference to the rights of those with whom municipal employees will come into contact. Kastle, supra at 34-35, citing City of Canton v. Harris, 489 US 378, 388 (1989). "Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions". White v. City of New York, supra at 16, citing Fiacco v. City of Rensselaer, 783 F2d 319, 328 (2nd Cir. 1986) ("Whether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force"). Thus, local governing bodies "may be sued for constitutional

deprivations visited pursuant to governmental custom even though such custom has not received formal approval through the government's official decision-making channels". White v. City of New York, supra at 16, citing Monell, 436 US at 659.

Warr's Monell claim arises from his arrest pursuant to the "longstanding City policy of Clearing the Block in high crime areas known for violence, drug dealing, trespassing, and numerous citizen complaints involving crime and quality of life issues" (See paragraph 51, Defendants' Statement of Undisputed Facts). The conduct of the Defendant officers is sufficiently brutal or egregious as to suggest deliberate indifference by the City of Rochester. As for prior complaints against the Defendant Officers, numerous complaints have been disclosed in this litigation which alerted RPD management of Defendants Ferrigno's and/or Liberatore's unfitness to be employed as police officers. Plaintiff's police expert Michael Levine reviewed these complaints which form the basis of his opinions set forth in his report and which will be given at trial.

## *Supervisory Liability*

With respect to supervisory liability, personal involvement need not be shown by "direct participation by the supervisor in the challenged conduct", but may be demonstrated by (1) failure to take corrective action after learning of a subordinate's unlawful conduct; (2) creation of a policy or custom fostering the unlawful conduct; (3) gross negligence in supervising subordinates who commit unlawful acts; or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates. Kastle v. The Town of Kent, et al., 2014 US Dist. Lexis 56125 at 38 (SDNY 2014).

Based on the foregoing, Defendant Sheppard failed to take corrective action after

learning of the Defendant Officers' misconduct since he upheld their exonerations in his Police Chief Review. Defendant Sheppard supported the policy of "Clearing the Block" which caused Warr's civil rights violations, he was grossly negligent is supervising the Defendant Officers who had prior misconduct histories and absolutely no training regarding the arrest of a wheel chaired person and he showed deliberate indifference to the rights of Warr and others by failing to act on the Defendant Officers' conduct. Rather, Defendant Sheppard  went on WCMF 96.5 radio after Warr was assaulted and proudly Showed support for the policy "Clearing the Block" and the Defendant Officers' actions.

**CONCLUSION**

Based on the foreging, the Plaintiffs respectfully request this Court deny Defendants' Motion For Summary Judgment pursuant to FRCP Rule 56 in its Entirety and grant such other and further relief as the Court deems just and proper.

Dated: October 13, 2016                    **BURKWIT LAW FIRM, PLLC**

                        s/Charles F. Burkwit
                        Charles F. Burkwit, Esq.
                        Attorneys for Plaintiffs
                        16 East Main Street, Suite 450
                        Rochester, New York 14614
                        (585) 546-1588
                        burkwitesq@aol.com

TO:    BRIAN F. CURRAN, Corporation Counsel
       Spencer L. Ash, Esq., of counsel
       Attorneys for Defendants
       City Hall Room 400A, 30 Church Street
       Rochester, New York 14614-7741
       (585) 428-6699
       ashs@cityofrochester.gov

20