UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT
FILED
SEP 0 5 2017
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

BENNY T. WARR and NINA M. WARR,

               Plaintiffs,

        v.

ANTHONY R. LIBERATORE, JOSEPH M.
FERRIGNO II, MITCHELL R. STEWART II,
JAMES M. SHEPPARD, and CITY OF
ROCHESTER,

               Defendants.

**DECISION AND ORDER**

6:13-CV-06508 EAW

## INTRODUCTION

Plaintiffs Benny T. Warr ("Warr") and Nina M. Warr (collectively, "Plaintiffs") filed this action on September 19, 2013, alleging various claims pursuant to 42 U.S.C. § 1983, as well as claims under New York state law. (Dkt. 1). Presently before the Court is a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 by defendants Anthony R. Liberatore ("Liberatore"), Joseph M. Ferrigno II ("Ferrigno"), Mitchell R. Stewart II ("Stewart"), James M. Sheppard ("Sheppard"), and the City of Rochester ("the City") (collectively, "Defendants"). (Dkt. 88).

For the reasons stated below, the motion is granted in part and denied in part.

## UNDISPUTED FACTUAL BACKGROUND[1]

This case arises out of Warr's arrest by Rochester Police Department ("RPD") officers on May 1, 2013. (*See* Dkt. 1). Liberatore and Ferrigno were patrol officers with RPD at the time of the incident, and their area of patrol included Jefferson Avenue in Rochester, New York. (Dkt. 88-2 at ¶ 7; Dkt. 93 at ¶ 7). Both officers went through police academy and field training prior to the incident. (Dkt. 88-2 at ¶ 8; Dkt. 93 at ¶ 8). Warr, who had been previously arrested, was at least six feet tall and weighed at least 247 pounds at the time of the May 1, 2013, arrest. (*See* Dkt. 88-2 at ¶¶ 27, 40; Dkt. 93 at ¶¶ 27, 40).

Surveillance video of the incident shows Warr, who was using a wheelchair at the time of his arrest, operating the wheelchair on the street and sidewalk on Jefferson Avenue throughout the afternoon and early evening of May 1, 2013. (*See* Dkt. 88-2 at ¶ 17; Dkt. 93 at ¶ 17). At 8:14 PM, Liberatore and Ferrigno called police dispatch to report suspicious activity on the 500 block of Jefferson Avenue, and proceeded to arrest Warr. (*See* Dkt. 88-2 at ¶¶ 9-10; Dkt. 93 at ¶ 9). Warr claims he was waiting for the bus when he was arrested. (Dkt. 88-2 at ¶ 20; Dkt. 93 at ¶ 20).

To effectuate the arrest, Ferrigno first administered pepper spray to Warr's face. (Dkt. 88-2 at ¶ 23; Dkt. 93 at ¶ 23). After the pepper spray, the RPD officers removed Warr from his wheelchair. (*See* Dkt. 88-2 at ¶ 28; Dkt. 93 at ¶ 28). Warr had not been frisked or checked for weapons before being removed from his wheelchair. (Dkt. 88-2 at

---

[1]     The undisputed facts are drawn from the parties' Local Rule 56 statements of undisputed facts. (*See* Dkt. 88-2; Dkt. 93).

¶ 28; Dkt. 93 at ¶ 28).  Once on the ground, Ferrigno administered knee strikes to Warr's abdomen, and "administered a 3 point stance" in an attempt to push Warr to the ground. (Dkt. 88-2 at ¶ 29; *see, e.g.*, Dkt. 93 at ¶ 29).  Liberatore then delivered an "elbow strike" to Warr's head.  (Dkt. 88-2 at ¶ 32; Dkt. 93 at ¶ 32).

After being taken into custody, Warr was charged with disorderly conduct, and transported to the hospital.  (Dkt. 88-2 at ¶ 42; Dkt. 93 at ¶ 42).  Warr received an adjournment in contemplation of dismissal as to the disorderly conduct charge.  (Dkt. 88-2 at ¶ 43; Dkt. 93 at ¶ 43).

RPD has a Professional Standards Section ("PSS") that is "assigned to review complaints against the police."  (Dkt. 93 at ¶ 63; *see, e.g.*, Dkt. 88-2 at ¶ 63).  "[B]ased upon the PSS investigation materials . . . , the RPD and [Civilian Review Board] exonerated Officers Ferrigno and Liberatore as to excessive force."  (Dkt. 93 at ¶ 67; *see, e.g.*, Dkt. 88-2 at ¶ 67).

## DISCUSSION

Warr asserts ten claims.  (Dkt. 1).  Pursuant to § 1983, Warr brings claims for: (1) illegal search and seizure against Ferrigno, Liberatore, Stewart, and the City; (2) excessive use of force against Ferrigno, Liberatore, Stewart, and the City; (3) conspiracy to violate Warr's constitutional rights against Ferrigno, Liberatore, and Stewart; (4) "failure to implement policies, customs and practices" claim against the City; and (5) a *Monell* claim against the City and Sheppard.  (*Id.* at ¶¶ 67-117).  Warr also brings claims under New York state law for: (1) battery against Ferrigno, Liberatore,

Stewart, and the City; (2) assault against Ferrigno, Liberatore, Stewart, and the City;

(3) intentional infliction of emotional distress against Ferrigno, Liberatore, Stewart, and

the City; (4) negligent infliction of emotional distress against Ferrigno, Liberatore,

Stewart, and the City; and (5) negligence against all Defendants. (*Id.* at ¶¶ 118-64).

Additionally, Nina Warr brings a claim for loss of consortium against all Defendants.[2]

(*Id.* at ¶¶ 165-67).

## I.    Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be

granted if the moving party establishes "that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The court should grant summary judgment if, after considering the evidence in the

light most favorable to the nonmoving party, the court finds that no rational jury could

find in favor of that party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Once the moving party has met its burden, the opposing party "must do more than

simply show that there is some metaphysical doubt as to the material facts. . . . [T]he

nonmoving party must come forward with specific facts showing that there is a *genuine*

---

[2]    Defendants offered no argument on summary judgment regarding Nina Warr's loss of consortium claim. Of course, if Warr's claims are dismissed, Nina Warr's claim must be dismissed as well because loss of consortium is a derivative claim that requires an underlying tort. *See Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 40 (2d Cir. 1996); *see, e.g., Cerqua v. Stryker Corp.*, No. 11 Civ. 9208(KBF), 2012 WL 5506119, at *5 (S.D.N.Y. Nov. 9, 2012) ("A loss of consortium claim is a derivative claim under New York Law, meaning it must be supported by an underlying tort action.").

issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87).   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).   "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

## II.   Warr's Federal Claims

### A.   Ferrigno and Liberatore Had Probable Cause to Arrest Warr

The Court interprets Warr's claim for illegal search and seizure as one for false arrest.   (*See* Dkt. 1 at ¶ 69 (alleging that Defendants violated Warr's "right to be free from unreasonable searches and seizures . . . and the right to be free from false arrest. . . ."); Dkt. 92 at 11 (arguing that Defendants "falsely arrested and unlawfully searched and seized Warr since they clearly lacked probable cause to believe that any crime had been committed by Warr prior to his arrest. . . .")).   Claims for false arrest may be brought pursuant to § 1983 because they implicate the Fourth Amendment's protection of an individual's liberty interest. *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995); *see also Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law.").   A plaintiff bringing such a claim must

meet the state law requirements for the underlying tort, *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010), and "show some deprivation of liberty consistent with the concept of 'seizure'" sufficient to implicate the Fourth Amendment. *Singer*, 63 F.3d at 116; *see also Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) ("In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred." (citation omitted)).

Under New York law, a plaintiff claiming false arrest "must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Savino v. City of N.Y.*, 331 F.3d 63, 75 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). Although the "[l]ack of probable cause is not an essential element," to establishing false arrest, *Williams v. City of N.Y.*, No. 14-cv-5123 (NRB), 2015 WL 4461716, at *4 (S.D.N.Y. July 21, 2015) (citations omitted), "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest. . . .'" *Weyant*, 101 F.3d at 852; *see, e.g.*, *Singer*, 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").

"In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. "The question of

- 6 -

whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Id.* (internal citations omitted).

Here, Defendants argue that probable cause existed to arrest Warr. (Dkt. 88-1 at 4-10). Warr was initially arrested for disorderly conduct under N.Y. Penal Law § 240.20. (Dkt. 88-2 at ¶ 42; Dkt. 93 at ¶ 42; *see, e.g.*, Dkt. 88-3 at 83). Under New York law:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
> 1. He engages in fighting or in violent, tumultuous or threatening behavior; or
> 2. He makes unreasonable noise; or
> 3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or
> 4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or
> 5. He obstructs vehicular or pedestrian traffic; or
> 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or
> 7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

N.Y. Penal Law § 240.20.

> To prove the crime of disorderly conduct under . . . § 240.20 the prosecution must establish three elements: (i) the defendant's conduct must be "public" in nature, (ii) it must be done with "intent to cause public inconvenience, annoyance or alarm" or with recklessness as to "a risk thereof," and (iii) it must match at least one of the descriptions set forth in the statute.

*Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001) (citation omitted). The disorderly conduct statute is intended "to deter breaches of the peace or, more specifically, of the community's safety, health or morals." *People v. Munafo*, 50 N.Y.2d

326, 331 (1980). Thus, the statute requires that the disturbance be public in nature, "beyond the concern of individual disputants. . . ." *Id.* Where the breach of the peace is in a crowded area, it is much more likely to be "public" in nature. *Compare id.* at 332 (finding the conduct was not "public" because it occurred "on a secluded stretch of [the defendant's] own property far removed from any public thoroughfare or business or residential area"), *with McDermott v. Justices of Supreme Court, N.Y., N.Y. Cty.*, 29 F. App'x 763, 764 (2d Cir. 2002) (finding that conduct was "public" because "the event occurred on a public street in New York City and that three persons had been present a few minutes earlier").

### 1. There is a Dispute of Material Fact as to Whether Warr Violated N.Y. Penal Law §§ 240.20(2) or (3)

Here, Warr was charged with violating §§ 240.20(2), (3), and (6). (Dkt. 88-3 at 83). Liberatore testified that Warr refused to leave the Jefferson Street area when told to do so. (*Id.* at 49). As to subsections (2) and (3), Defendants argue that Warr "was yelling profanities at the officers when he was told to move. . . ." (Dkt. 88-1 at 6; *see, e.g.*, Dkt. 88-11 at 50 (stating that after being ordered to disperse "Warr became irate towards the officers and began shouting 'fuck you motherfuckers' at them. . . . Warr was again told to leave by . . . Ferrigno. At this time, . . . Warr screamed 'man, suck my dick' multiple times. . . .")). However, Warr swears that he never made those statements to the officers, and that he "did nothing to provoke . . . Ferrigno and Liberatore. . . ." (Dkt. 94 at ¶ 13; *see, e.g., id.* at ¶ 22 ("On the evening of May 1, 2013, I never used any profanity towards . . . Ferrigno and/or Liberatore and never acted in a manner that would constitute

- 8 -

disorderly conduct towards these officers.")).   Warr's sworn statements are corroborated by testimony from others who were present at the time of the arrest.  (Dkt. 93-4 at 1; Dkt. 93-5 at 1).  There is a clear issue of fact as to whether Warr made any vulgar or obscene comments to the officers prior to his arrest.

### 2.   There is an Issue of Material Fact as to Whether Ferrigno and Liberatore had Probable Cause to Arrest Under N.Y. Penal Law § 240.20(6)

Defendants argue that even if there is a factual dispute about whether Warr used abusive language, there was probable cause to arrest Warr under § 240.20(6) because he was told to disperse and refused to do so.[3]  (*See* Dkt. 88-1 at 6).  Under New York law, "[a] refusal to obey [a dispersal order] can be justified only where the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order."  *People v. Galpern*, 259 N.Y. 279, 284-85 (1932); *see, e.g.*, *Kass v. City of N.Y.*, 864 F.3d 200, 212 (2d Cir. 2017); *Crenshaw v. City of Mt. Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010); *but see United States v. Nelson*, 500 F. App'x 90, 93 (2d Cir. 2012) (avoiding deciding whether *Galpern* remains good law); *Wiles v. City of N.Y.*, No. 13-cv-2892 (TPG), 2016 WL 6238609, at *8 (S.D.N.Y. Oct. 25, 2016) (noting that although no court has expressly decided that

---

[3]      As a threshold matter, contrary to Defendants' claims (*see* Dkt. 88-1 at 6), Warr's actions prior to the officers' arrival on Jefferson Avenue at 8:05 PM on May 1, 2013, are immaterial to determining whether the officers had probable cause to arrest, for there is nothing in the record to show that either Ferrigno or Liberatore was aware of Warr's earlier actions at the time of the arrest. *See Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) ("[T]he probable cause inquiry is based upon whether the facts known by the arresting officer *at the time of the arrest* objectively provided probable cause to arrest." (emphasis added)).

*Galpern* was not good law, "*Galpern*'s future as controlling authority is [uncertain]" because of "a series of Supreme Court cases which further refined the constitutional limits of anti-loitering and disorderly conduct statutes").

Warr contends that the officers did not have a sufficient basis to order him to disperse, because he "was not engaged in suspicious and evasive behavior. . . ." (Dkt. 92 at 10). Warr was twice told by the officers to disperse. Defendants posit that the first dispersal order was lawful because Ferrigno and Liberatore saw Warr and Derrick Latham "trespassing on private property . . . near groups of other individuals who were crowding the sidewalk and street." (Dkt. 88-1 at 6-7). Ferrigno and Liberatore drove down the 500 block of Jefferson Avenue in their patrol car at approximately 8:05 PM and claim to have told a group of individuals—one of whom was Warr—to "clear the sidewalks and storefronts." (Dkt. 88-2 at ¶ 11; *see, e.g.,* Dkt. 88-3 at 49). A police car, presumably Ferrigno and Liberatore's, can be seen on surveillance footage driving past Warr at 8:05:07 PM. (*See* Dkt. 88-3 at 81 (the Blue Light Camera video)). On the video, Warr is in his wheelchair on the east side of the street, and the patrol car appears to stop in front of Warr. (*See id.*). When the officers pulled up and gave the first dispersal order, Warr was seated near approximately five men. (*See id.*; Dkt. 94 at ¶¶ 7-8).

Ferrigno and Liberatore could reasonably have suspected that the group of individuals, which included Warr, was in violation of § 240.20(5), which disallows the causing of public inconvenience by "obstruct[ing] . . . pedestrian traffic" on the sidewalk. *See* N.Y. Penal Law 240.20(5). The group can be seen on video taking up the entire

- 10 -

sidewalk. (*See* Dkt. 88-3 at 81). There are other pedestrians in the area. (*See id.*). Thus, the first dispersal order was not "purely arbitrary" such that the order itself was unlawful. However, the undisputed facts also appear to indicate that Warr complied with that initial order, and left the area.

After giving the initial order, Ferrigno and Liberatore exited their patrol car. (Dkt. 88-2 at ¶ 12). The surveillance footage shows them walking up Jefferson Avenue as early as 8:08:15 PM. (*See* Dkt. 88-3 at 81). By the time Ferrigno and Liberatore returned to the 500 block of Jefferson Avenue, Warr had moved to the other side of the street. (*See id.*). Warr claims he was waiting for the bus with two others. (Dkt. 94 at ¶¶ 10-11).

It is undisputed that the officers again commanded Warr to disperse, and that he failed to do so. (*See* Dkt. 88-3 at 49; Dkt. 94 at ¶ 12). Liberatore testified that at approximately 8:14 PM he again "gave verbal commands" to Warr to disperse. (Dkt. 88-3 at 49). Although others started walking away "immediately" (Dkt. 88-3 at 49; *see, e.g.*, Dkt. 94 at ¶ 12), Warr remained. (Dkt. 93-2 at 16; *see, e.g.*, Dkt. 94 at ¶ 12). Warr acknowledges that he refused to leave the area after being commanded to do so. (Dkt. 94 at ¶¶ 10-12).

Thus, although there is no dispute that Warr failed to comply with the second command, this Court cannot resolve on this record whether the second command was purely arbitrary. If, as Warr claims, he was at the bus stop waiting to catch the bus (thereby complying with the officers' first command to leave the area), the officers' second command to disperse may have been purely arbitrary. A jury will have to

determine whether there was a legitimate reason for the officers' second command, and, as such, summary judgment is inappropriate.

**B.      Summary Judgment is Not Appropriate for Warr's Excessive Use of Force Claim**

**1.      There is an Issue of Material Fact**

Defendants argue that summary judgment is also warranted for Warr's excessive use of force claim. (Dkt. 88-1 at 10-14). Claims that "law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' . . . are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard. . . ." *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The pertinent inquiry is 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Paul v. City of Rochester*, 452 F. Supp. 2d 223, 226 (W.D.N.Y. 2006) (quoting *Graham*, 490 U.S. at 397). Reasonableness is "not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396. An evaluation of the reasonableness of an officer's actions should consider "all the facts of the case, including the severity of the crime, whether the arrestee posed an immediate threat to the safety of others, and whether he actively resisted the arrest." *Carey v. Maloney*, 480 F. Supp. 2d 548, 556 (D. Conn. 2007).

The factors are viewed from the perspective of a reasonable officer at the time of the incident. *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Here, Defendants argue that Ferrigno, Liberatore, and Stewart's actions in subduing Warr were objectively reasonable given the circumstances in which the officers found themselves. (*See* Dkt. 88-1 at 11). Defendants argue that Warr disregarded verbal commands and did not react to the application of pepper spray. (*Id.*). Because they could not gain compliance, they argue that it was necessary to remove Warr from his wheelchair. (*Id.* at 12). Ferrigno testified that Warr "refused to place his hands behind his back." (Dkt. 88-3 at 58). According to Ferrigno, he then tried to force Warr's hands behind his back, but Warr pulled his hands away and struck Ferrigno. (*Id.*). Warr was then removed from the wheelchair, and officers administered one elbow strike and two to three knee strikes to effectuate the handcuffing and arrest. (Dkt. 88-1 at 11). Stewart arrived on scene after Warr had been removed from his wheelchair, and assisted Ferrigno and Liberatore in handcuffing Warr. (*See* Dkt. 93-3).

Warr, for his part, swears that he "did nothing to provoke [] Ferrigno and Liberatore. . . ." (Dkt. 94 at ¶ 13). Warr claims he "never swung [his] arms to avoid being handcuffed and [] never struck [] Ferrigno near his groin or any part of his body." (*Id.* at ¶ 32; *see, e.g.*, *id.* at ¶ 35 ("I never swung my arms, struggled or struck any of the Defendant officers. . . .")). After being sprayed with pepper spray, his wheelchair was pushed over, causing him to fall on the sidewalk. (*Id.* at ¶ 14).

There is clearly a dispute of material fact as to whether Warr swung his arms and struck Ferrigno or otherwise resisted arrest while seated in his wheelchair, thereby necessitating additional force by Ferrigno, Liberatore, and Stewart. In support of their motion, Defendants point to the various video recordings of the arrest, arguing that the videos show that the use of force was not excessive. (Dkt. 88-1 at 12). Specifically, Defendants argue that "this case is very unique in that the entire course of physical contact between [] Defendants and [] Warr was captured on video. . . ." (Dkt. 88-1 at 18). The videos capture the ground strikes and eventual arrest of Warr. The earliest part of the interaction captured on video shows Ferrigno and Liberatore removing Warr from the wheelchair, but no video shows Warr's actions prior to being removed from his wheelchair. (*See* Dkt. 93-3). Thus, there remains a question of fact as to what happened prior to Warr's removal from his wheelchair.

Warr, as the non-moving party, is entitled to have the evidence construed in his favor. So construed, a reasonable jury could credit Warr's version of events that he never fought against the officers or refused to comply with their commands such that additional force—including taking Warr out of his wheelchair—was necessary. And, contrary to Defendants' arguments, the video evidence is not dispositive on this issue. Defendants have not met their burden to show that there is no issue of material fact regarding Warr's excessive use of force claim.

2.     **Defendants' Qualified Immunity Defense Cannot be Resolved at this Juncture**

Defendants also argue that, even if there are disputed issues of material fact with respect to Warr's excessive force claim, Defendants are nonetheless entitled to qualified immunity and, accordingly, summary judgment is warranted. (Dkt. 88-1 at 16-19).

> A police officer is entitled to qualified immunity from liability for his discretionary actions if either (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act.

*Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001). "A right is considered to be 'clearly established' if 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 438 U.S. 635, 640 (1987)). "The second prong of the qualified immunity analysis permits [the] court to grant summary judgment if a reasonable officer could have believed his or her actions were lawful." *Simpson v. City of N.Y.*, 793 F.3d 259, 268 (2d Cir. 2015) (citation omitted).

The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness." *Manganiello*, 612 F.3d at 165. "Officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'" *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

"The Supreme Court has . . . made it clear that even officers who are found to have used excessive force may be entitled through the qualified immunity doctrine to an extra layer of protection 'from the sometimes hazy border between excessive and acceptable force.'" *Stephenson v. Doe*, 332 F.3d 68, 77 (2d Cir. 2003) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)).   "The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

Here, there is a question of fact as to what circumstances Ferrigno and Liberatore faced when they allegedly used excessive force to effectuate the arrest of Warr. Therefore, the Court cannot make a determination as to what a reasonable officer would have believed was reasonable in light of the circumstances.   Accordingly, summary judgment is inappropriate based on qualified immunity. *See, e.g.*, *Yin v. NFTA*, 188 F. Supp. 3d 259, 272 (W.D.N.Y. 2016) (denying, on summary judgment, a qualified immunity defense where there remained an issue of material fact as to the excessive use of force).

C.   **Warr's Conspiracy Claim Must be Dismissed**

Defendants next argue that Warr has failed to put forward any evidence of a conspiracy. (Dkt. 88-1 at 16).   "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). "[T]o survive a motion for summary judgment, the non-moving party's

evidence of a § 1983 conspiracy must, at least, reasonably lead to the inference that [the defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Phoenix v. Reddish*, 175 F. Supp. 2d 215, 218 (D. Conn. 2001).

Here, Defendants have met their burden in showing that summary judgment is appropriate, and Warr has come forward with no evidence of a conspiracy. The mere fact that the officers were all present at the time of the alleged constitutional violations is insufficient to support a conspiracy claim. *Id.* ("The plaintiff's only evidence of a conspiracy is that [the defendant] was present when the alleged unconstitutional conduct occurred. This amounts to nothing more than rank speculation and conjecture. . . ."). Warr argues that the video evidence shows that "a conspiracy is evident" from the officers' movements before approaching Warr. (Dkt. 92 at 14). The video evidence does no such thing, and no reasonable jury could interpret the video evidence to show that Ferrigno and Liberatore (and later Stewart) had unconstitutionally agreed to violate Warr's rights. Any finding to the contrary would be pure speculation. In the absence of any evidence of agreement, summary judgment is warranted. *Ostensen v. Suffolk Cty.*, 236 F. App'x 651, 653 (2d Cir. 2007).

Additionally, Warr's conspiracy claim is also likely barred by the intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine "bars conspiracy claims against employees of entities . . . (when those employees are alleged to have conspired solely with each other) unless . . . the employees were pursuing personal interests wholly

separate and apart from the entity by whom they were employed." *Richard v. Fischer*, 38 F. Supp. 3d 340, 353 (W.D.N.Y. 2014) (citation omitted); *see, e.g.*, *Murphy v. City of Stamford*, 634 F. App'x 804, 805 (2d Cir. 2015) ("[U]nder the intracorporate conspiracy doctrine, the 'officers, agents, and employees of a single corporate entity are legally incapable of conspiring together.'" (quoting *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008)).

"The Second Circuit has recognized the doctrine in the Section 1985 context, *see* [*Hartline*, 546 F.3d at 99 n.3], but has not yet determined its applicability to Section 1983 conspiracy claims." *Hicks v. City of N.Y.*, 232 F. Supp. 3d 480, 497 (S.D.N.Y. 2017). The vast majority of district courts in this Circuit to have addressed the issue have found that the doctrine applies to § 1983 claims. *See id.* (applying the doctrine); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013) (same and collecting cases). *But see Peacock v. City of Rochester*, No. 6:13-cv-6046-MAT, 2016 WL 2347448, at *12 (W.D.N.Y. May 4, 2016) (refusing to apply the doctrine in the § 1983 context). The Court finds, in accordance with the majority of district courts, "that the rationale behind the intracorporate conspiracy rule—that there is no conspiracy if the conduct is essentially a single act by agents of a single entity acting with the scope of their employment—applies with equal force in the [§] 1983 context." *Chamberlain*, 986 F. Supp. 2d at 388.

Here, the three officers who purportedly engaged in a conspiracy were all RPD officers at the time of the events, and are alleged to have conspired only with each other.

There is no evidence in the record that they were pursuing personal interests beyond their scope of employment. Therefore, even if Warr had presented evidence of an agreement—and, to be clear, he has not—the intracorporate conspiracy doctrine would likely bar Warr's conspiracy claim.

### D.    Warr's *Monell* Claim Must be Dismissed

Defendants next argue that Warr has failed to establish municipal liability under § 1983. (Dkt. 88-1 at 19-21). Specifically, Defendants argue that Warr has failed to prove deliberate indifference by the municipality because the evidence submitted is merely "a disjointed collection of unsubstantiated complaints. . . ." (*Id.* at 19).

"The Supreme Court has made clear that 'a municipality cannot be made liable' under § 1983 for acts of its employees 'by application of the doctrine of *respondeat superior*.'" *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986)). In order to maintain a § 1983 action against a municipal defendant, a plaintiff must identify a municipal "policy or custom" from which the alleged injury arose. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

> A plaintiff may satisfy the "policy or custom" requirement by alleging the existence of "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees."

*Perrone v. O'Flynn*, 11-CV-6411 CJS-MWP, 2015 WL 7776930, at *5 (W.D.N.Y. Dec. 2, 2015) (quoting *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 301 (S.D.N.Y. 2015) (citation omitted)).

"[A] claim of inadequate training will trigger municipal liability only where the failure to train amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact." *Walker v. City of N.Y.*, 974 F.2d 293, 297 (2d Cir. 1992). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). This is because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

Here, Warr first argues that summary judgment is inappropriate because Ferrigno and Liberatore's conduct was "sufficiently brutal or egregious as to suggest deliberate indifference by the City. . . ." (Dkt. 92 at 19). This argument merely seeks to make the City liable through *respondeat superior*. The argument does not present a pattern of conduct nor any formal policy perpetrated by the City to establish *Monell* liability. As such, this argument is easily rejected.

Warr next argues that the City was on notice as to the officers' "unfitness to be employed as police officers" because of prior complaints about their conduct. (*Id.*). Defendants have met their burden on summary judgment, and Warr has submitted *no*

*evidence* of prior complaints.   Warr points only to his expert's report to support this claim.   (*See id.*).   However, the purported complaints are not attached to the report, and the report omits significant portions of the "Materials/Exhibits Reviewed" section (*see* Dkt. 97 at 270-96), such that the Court cannot determine whether the expert reviewed *any* prior complaints regarding Ferrigno or Liberatore.   Thus, even assuming that the expert's opinion was admissible—a proposition which Defendants strenuously contest (*see* Dkt. 98)—based on the information before the Court, there is no foundation for any opinion regarding prior complaints.   As such, Warr has failed to sufficiently oppose the properly supported motion for summary judgment, and, therefore, summary judgment is appropriate.   *See, e.g.*, Fed. R. Civ. P. 56(c)(1) (requiring a party to support an assertion that there is an issue of material fact by "citing to particular parts of materials *in the record*" (emphasis added)).

### E.   Warr's Supervisory Liability Claims

Defendants argue that Warr's supervisory liability claim against Sheppard must also be dismissed.   (Dkt. 88-1 at 21).   A supervisory defendant must have been personally involved in a constitutional deprivation to be held liable under § 1983.   *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986); *see Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("Supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." (citation omitted)).   "[A] plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676

(2009). Personal involvement may be shown where:

> A supervisory official, after learning of the violation through a report or appeal, . . . failed to remedy the wrong[;] . . . created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue[; or] . . . was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Williams,* 781 F.2d at 323-24 (internal citations omitted). However, a "'plaintiff cannot

base liability solely on the defendant's supervisory capacity or the fact that he held the

highest position of authority' within the relevant governmental agency or department."

*Houghton v. Cardone*, 295 F. Supp. 2d 268, 276 (W.D.N.Y. 2003) (citation omitted).

Here, Warr argues that Sheppard can be held liable as a supervisor because he

failed to take corrective action after being informed of Ferrigno, Liberatore, and

Stewart's misconduct "since he upheld their exonerations in his Police Chief Review."[4]

(Dkt. 92 at 19-20).  As noted above, there exists a genuine issue of material fact

regarding whether the officers violated Warr's constitutional rights in using excessive

force.  Following the incident, Warr filed a complaint against Ferrigno and Liberatore

alleging excessive use of force.  (*See* Dkt. 88-2 at ¶ 65; Dkt. 94 at ¶ 51).  According to

Defendants, Sheppard was involved in reviewing Warr's complaint.  (Dkt. 88-2 at ¶ 67).

Consequently, Sheppard had actual notice of the violation.  *Cf. Wright v. Smith*, 21 F.3d

496, 501 (2d Cir. 1994), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472

---

[4]     To the extent that Warr claims supervisory liability based on the "prior misconduct histories" of Ferrigno and Liberatore (*see* Dkt. 92 at 20), as discussed above, Warr has submitted no evidence of any such history.

(1995).  The RPD's review of Warr's complaint—which included Sheppard's own review—exonerated Ferrigno and Liberatore.  (Dkt. 88-2 at ¶ 67).  Thus, Sheppard was informed of a potential violation of Warr's constitutional rights by Ferrigno and Liberatore, and failed to right the alleged wrong, despite having the opportunity to do so through the complaint review process.  These circumstances give rise to the potential for § 1983 supervisory liability, *see Williams,* 781 F.2d at 323-24, and, as such, summary judgment is inappropriate.

## III.  Warr's State Law Claims

### A.    Warr's Assault and Battery Claims

"Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery claims are substantially identical."  *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (quotation and alterations omitted); *see also Benson v. Yaeger*, No. 05-CV-784S, 2009 WL 1584324, at *4 n.6 (W.D.N.Y. June 3, 2009) ("The test for whether a plaintiff can maintain a New York State law assault and battery cause of action against law enforcement officials is the exact same test as the one used to analyze a Fourth Amendment excessive force claim. . . .") (citation omitted).  "[U]nder New York state law, a municipality may be held vicariously liable on state law claims asserted against individual officers under a theory of *respondeat superior*.  This includes claims against a municipality for the actions of its officers in committing assault and battery."  *Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 267 (N.D.N.Y. 2014) (citations omitted).

- 23 -

As set forth above, genuine issues of material fact exist as to Warr's excessive use of force claim. Because the same analysis applies to Warr's assault and battery claim, the Court denies Defendants' motion for summary judgment as to these causes of action.

## B.   Warr's Intentional Infliction of Emotional Distress Claim Must Be Dismissed as Duplicative

Defendants argue that Warr's intentional infliction of emotional distress claim cannot stand because Warr raises claims for traditional torts—assault and battery. (Dkt. 88-1 at 14). Under New York law, intentional infliction of emotional distress requires a showing of: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co., Inc.*, 612 N.Y.2d 115, 121 (1993). However, intentional infliction of emotional distress is generally unavailable where other traditional tort remedies are available. *Naccarato v. Scarselli*, 124 F. Supp. 2d 36, 44 (N.D.N.Y. 2000); *see, e.g.*, *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) ("[T]he New York Court of Appeals has questioned whether an intentional infliction claim can ever be brought where the challenged conduct 'falls well within the ambit of other traditional tort liability.' All four Appellate Division courts have answered the question and held that it cannot." (citation omitted)); *Jackson v. City of N.Y.*, 29 F. Supp. 3d 161, 183 (S.D.N.Y. 2014) (dismissing an intentional infliction of emotional distress claim on summary judgment where the plaintiff also claimed "assault, battery, and false arrest"); *Leonard v. Reinhardt*, 20 A.D.3d 510, 510 (2d Dep't 2005) ("Here, the cause of action alleging intentional

infliction of emotional distress should have been dismissed as duplicative of the causes of action alleging malicious prosecution and assault and battery."); *see also Fischer v. Maloney*, 43 N.Y.2d 553, 557-58 (1978) ("[I]t may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability, here malicious prosecution and abuse of process."), *recognized as dictum in Gonazales v. Bratton*, 48 F. App'x 363, 365 (2d Cir. 2002); *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 256 A.D.2d 269, 270 (1st Dep't 1998) ("Development of [intentional infliction of emotional distress] reflects the acknowledgment by the courts of the need to afford relief where traditional theories of recovery do not."). However, where a plaintiff can show that there are elements of an intentional infliction of emotional district claim which do not completely overlap with other traditional torts, a standalone claim may be available under New York law. *See Rentas v. Ruffin*, 816 F.3d 214, 227 (2d Cir. 2016) (citing *Bender v. City of N.Y.*, 78 F.3d 787, 792 (2d Cir. 1996)).

Here, Warr argues that his intentional infliction of emotional distress claim is proper because of the officers' excessive use of force and the injuries resulting therefrom. (Dkt. 92 at 13). Warr's claims resulting from the incident are wholly encompassed in the other intentional torts alleged by Warr—*i.e.*, false arrest, excessive use of force, assault, and battery. Warr has not alleged any element of an intentional infliction of emotional distress claim that is different or in addition to what is recoverable under the traditional torts alleged. (*See id.* (noting that the intentional infliction of emotional distress claim

was pled as an alternative form of liability)).  As such, Warr's claim for intentional infliction of emotional distress is duplicative and must be dismissed.  *See, e.g.,* *Naccarato*, 124 F. Supp. 2d at 44-45 ("[S]ince the conduct complained of are encompassed in [the] plaintiff's claims for assault and battery and malicious prosecution, [the] plaintiff's claim for intentional infliction of emotional distress must be dismissed.").

### C.   Warr's Negligence and Negligent Infliction of Emotional Distress Claims are Improper

Defendants argue that Warr's claims for negligence and negligent infliction of emotional distress cannot lie because Warr also raises claims for intentional torts. (Dkt. 88-1 at 15).  Under New York law, "[w]hen a plaintiff asserts excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Dineen ex rel. Dineen v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002).  "[O]nce intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently." *Mazzaferro v. Albany Motel Enters., Inc.*, 127 A.D.2d 374, 376 (3d Dep't 1987).

Here, Warr's theory of recovery cannot be read as arising in negligence, as Warr clearly asserts intentional conduct by Defendants.  Warr does not claim that Defendants owed a duty of care and then breached that duty. *See Pasternack v. Lab. Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015) ("The elements of a negligence claim under New York law are: '(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach.'" (citation omitted)).  Instead,

Warr asserts that Defendants intentionally caused harm in effectuating his arrest through the excessive use of force, assault, and battery. As Warr cannot maintain a negligence cause of action where the claims are premised on intentional conduct, summary judgment is appropriate on Warr's claims for negligence and negligent infliction of emotional distress.

## CONCLUSION

For the foregoing reasons, Defendants' motion is granted in part and denied in part. The following claims remain: (1) false arrest against Ferrigno, Liberatore, and Stewart; (2) excessive use of force against Ferrigno, Liberatore, and Stewart; (3) supervisory liability against Sheppard; (4) assault against Ferrigno, Liberatore, Stewart, and the City; (5) battery against Ferrigno, Liberatore, Stewart, and the City; and (6) loss of consortium against all Defendants.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: September 5, 2017
        Rochester, New York

- 27 -