UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BENNY T. WARR and NINA M. WARR,

                    Plaintiffs,

       v.

ANTHONY R. LIBERATORE, et. al,

                 Defendants.[1]
_____

AMENDED DECISION & ORDER

13-CV-6508P

## **PRELIMINARY STATEMENT**

        Plaintiffs Benny T. Warr ("Warr") and his wife Nina M. Warr (collectively, "plaintiffs") commenced this action on September 19, 2013, against three Rochester Police Department ("RPD") officers, Anthony R. Liberatore ("Liberatore"), Joseph M. Ferrigno, II ("Ferrigno"), and Mitchell R. Stewart, II ("Stewart"), and the City of Rochester (collectively, "defendants") asserting claims pursuant to 42 U.S.C. § 1983 and New York State law for injuries arising from Warr's May 1, 2013 arrest for disorderly conduct.[2] (Docket # 1). On December 4, 2017, the parties consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c). (Docket # 116).

---

[1] Consistent with the parties' submissions in connection with this motion (Docket ## 158, 165, 170, 171-1, 174), the caption of the Court's March 20, 2020 Decision & Order is hereby amended to include defendants Joseph M. Ferrigno, II, Mitchell R. Stewart, II, James M. Sheppard, and the City of Rochester, in addition to defendant Anthony Liberatore. Other than the modification to the caption, the amended decision and order is identical to the original.

[2] Former RPD Chief James M. Sheppard ("Sheppard") was also named as a defendant in the action, but was granted judgment as a matter of law and dismissed from the action following plaintiffs' presentation of their case-in-chief, pursuant to Rule 50 of the Federal Rules of Civil Procedure. (Docket # 141).

Following an eleven-day jury trial, during which plaintiffs were represented by Charles F. Burkwit, Esq. ("Burkwit") and defendants were represented by Spencer L. Ash, Esq. ("Ash"), and after more than a day of deliberations, the jury returned a verdict in favor of all individual defendants on Warr's claims for unlawful arrest, assault, and battery, and in favor of defendants Ferrigno and Stewart on Warr's claim for excessive force.[3] (Docket # 148 at ¶¶ 1-3, 5-11). The jury determined that Liberatore was liable on Warr's Section 1983 claim for excessive force against him. (*Id.* at ¶ 4). Currently pending is plaintiffs' motion to set aside the verdict, grant a new trial, and impose sanctions. (Docket ## 158, 170).[4] Also pending is an Order to Show Cause issued by this Court on March 3, 2020. (Docket # 172). For the reasons discussed below, the Court denies plaintiffs' motion to set aside the verdict and for a new trial and grants in part the motion for sanctions.

## FACTUAL BACKGROUND

As explained in previous decisions in this matter, familiarity with which is assumed (*see, e.g.*, Docket ## 102, 117, 166, 169), this lawsuit arises out of the May 1, 2013 arrest of Warr, a heavyset man who uses a wheelchair and a left leg prosthesis as a result of an above-the-knee amputation, at the intersection of Jefferson Avenue and Bartlett Street in the City of Rochester. During the trial, the jury heard testimony from Warr, the defendant officers, and eyewitnesses, including Derrick Latham ("Latham"), Tache Young ("Young"), and Mary Adams; plaintiffs and defendants also presented testimony from several expert witnesses. The

---

[3] Judgment was also entered in favor of the City of Rochester (Docket # 149) because the only claims against the City (the tort claims) were premised on the doctrine of vicarious liability.

[4] Following the trial, Liberatore also moved for judgment in his favor on the excessive force claim on the grounds of qualified immunity. (Docket ## 152, 153, 155). In a written decision dated August 29, 2019, the Court denied Liberatore's motion. (Docket # 169).

jury viewed two video recordings of the events leading up to the arrest and the arrest itself, one of which was recorded by a blue light camera near the location of the arrest (the "blue light video"), and the other of which was recorded by Young on a cellular phone (the "cellphone recording"). (Plaintiffs' Exhibits ("Exs.") 1 and 2). The cellphone recording contains audio; the blue light video does not.

While the parties' versions of events conflicted in several meaningful respects, including whether the officers informed Warr that he was under arrest, whether Warr resisted the officers' efforts to arrest him, and whether Warr used profanities or refused to comply with the officers' orders, the parties generally agreed that the officers used force against Warr in connection with his arrest for disorderly conduct. In relevant part, the evidence demonstrated that at some point during the altercation between the officers and Warr, Ferrigno deployed pepper spray into Warr's face. (Tr. A 257).[5] Shortly thereafter, Liberatore pushed over Warr's wheelchair, causing Warr to fall to the ground. (Tr. A 258). While Warr was on the ground, the officers attempted to pull Warr's arms behind his back in order to apply handcuffs, Ferrigno delivered at least three knee strikes to Warr's abdominal area, and Liberatore delivered an elbow strike to Warr's head. (Tr. A 257-59; Tr. B 24-25). Stewart arrived at the scene after Warr was already on the ground and assisted Liberatore and Ferrigno to handcuff Warr. (Tr. A 260-61).

## I.    Summary of Evidence

For his part, Warr testified that his encounter with the officers began after he overheard them order a group of individuals to disperse from the area in front of a store on Jefferson Avenue. (Tr. A 246). According to Warr, without conversing with or responding to

---

[5]    The trial transcript shall be referred to as "Tr. A ___," (Docket ## 170-3, 170-4, 170-5, 170-6, 170-7, 170-8, 170-9, 170-11, 170-12) and "Tr. B __," (Docket # 170-10).

the officers, he crossed the street in order to catch a bus. (Tr. A 247). While waiting for the bus, Warr was approached by Ferrigno and Liberatore, and Ferrigno ordered Warr to move. (Tr. A 257). Warr explained that he was waiting for the bus, at which point Ferrigno deployed pepper spray into his face. (Tr. A 257). According to Warr, the officers pushed over his wheelchair, causing his head and left side of his body to strike the ground. (Tr. A 258-59). While he was on the ground, Warr felt kicks, knee strikes, and an elbow to his head. (Tr. A 259-62). Warr testified that at no point was he told that he was under arrest and he never attempted to resist arrest or to strike the officers. (Tr. A 257-58, 262, 264).

Warr testified that he suffered various injuries as a result of the incident: specifically, three fractured ribs, injury to his residual limb, preventing him from wearing a prosthetic leg, exacerbation of his chronic back pain, a neck injury, a traumatic brain injury characterized by headaches and memory loss, and post-traumatic stress disorder ("PTSD"). (Tr. A 268-78). Warr also offered testimony from several medical experts in support of his claimed injuries. Clifford Ameduri ("Ameduri"), MD, opined that Warr indeed suffered the identified physical injuries and that they were caused by the May 1, 2013 arrest. (Tr. A 614, 638, 640-46, 650). Michael Kuttner ("Kuttner"), Ph.D., testified that in his opinion Warr suffered from PTSD with dissociative symptoms as a result of the arrest. (Tr. A 721). Kenneth Reagles ("Reagles"), Ph.D., a rehabilitation psychologist, testified that he developed a life care plan for Warr to identify and value the future health-related goods and services Warr would require as a result of his injuries. (Tr. A 120-33). Reagles also provided an opinion regarding the value of the household work that Warr is no longer able to perform as a result of the incident. (Tr. A 118-20). Finally, Ronald Reiber ("Reiber"), Ph.D., an economist, estimated the future

cost of Warr's life care plan, as well as the cost to replace the household services Warr can no longer perform. (Tr. A 330).

Ferrigno and Liberatore testified that when they initially encountered Warr on May 1, 2013, they ordered him to disperse from the area. (Tr. A 1152-54, 1255). Warr refused and responded with profanities. (Tr. A 1154, 1206, 1255-56). At that time, Ferrigno told Warr that he was under arrest, but Warr left the immediate vicinity and crossed the street to the area of the bus stop. (Tr. A 1154, 1206, 1256). Ferrigno and Liberatore continued to disperse people from the street and then approached Warr to arrest him for disorderly conduct. (Tr. A 1162-64, 1213, 1256-57). According to the officers, Warr refused to comply with their instructions to place his hands behind his back; when they attempted to gain control of his wrists, Warr began flailing his arms. (Tr. A 1165, 1258). Ferrigno testified that as he continued to attempt to obtain control of Warr's wrist, Warr struck him in his groin area. (Tr. A 1166, 1239). At that time, Ferrigno deployed pepper spray to Warr's face. (Tr. A 1166, 1258-59). The officers continued to attempt to gain control of Warr's hands, and Liberatore pushed Warr's wheelchair over, causing Warr to fall to the ground. (Tr. A 1167-68, 1259-60). The officers testified that Warr continued to resist arrest while on the ground. (Tr. A 1168-69, 1260-62). Ferrigno testified that he delivered knee strikes to Warr's abdomen, and Liberatore testified that he delivered an elbow strike to Warr's head. (Tr. A 1231, 1234, 1263-64). Stewart testified that Warr was already on the ground when he arrived on scene. (Tr. A 1305-06). He assisted in the arrest by attempting to pull Warr's arm behind his back and by using two sets of handcuffs to secure Warr's hands. (Tr. A 1306, 1316-17, 1323).

Defendants also introduced the testimony of two experts, Ralph Benedict ("Benedict"), Ph.D., a neuropsychologist, and Robert W. Molinari ("Molinari"), MD, an

orthopedic surgeon, both of whom reviewed Warr's medical records and conducted independent medical examinations of him. (Tr. A 420-89). Benedict testified that Warr suffered from several health issues prior to the May 1, 2013 arrest, including chronic pain, depression, and substance abuse. (Tr. A 424). According to Benedict, an MRI of Warr's brain did not demonstrate any trauma-related injury, and he found no evidence that Warr suffered a severe concussion. (Tr. A 428, 449). Benedict agreed that Warr had suffered a concussion and PTSD as a result of the arrest, but disagreed that he had suffered resulting post-traumatic encephalopathy. (Tr. A 436, 444-46, 453). Benedict testified that his evaluation of Warr depended, in part, upon Warr's self-report of his symptoms. (Tr. A 429-30). According to Benedict, he found that Warr engaged in some degree of exaggeration during the examination, and he could not exclude the possibility that "secondary gain factors," including the pending litigation, had influenced the results of the examination. (Tr. A 429-30).

Molinari testified that Warr suffered from several pre-existing conditions, including obesity, hypertensive heart disease, type 2 diabetes, and significant arthritis in his neck and back. (Tr. A 462-63). Molinari opined that Warr did not suffer a traumatic spine injury as a result of the May 1, 2013 incident, although he did believe that the encounter had exacerbated Warr's existing arthritis. (Tr. A 463-64, 472, 483, 485, 489).

## II. Evidentiary Rulings and Limiting Instructions

In the weeks preceding trial, the parties identified and briefed numerous legal and evidentiary issues, as to which the Court heard argument and conducted an evidentiary hearing. During those proceedings, the Court issued various *in limine* rulings relevant to the issues currently pending before the Court and subsequently issued a written order reflecting those

rulings. (Docket # 133). Those rulings included determinations concerning the admissibility of evidence relating to the history of crime or vice activity in the vicinity of the 500 block of Jefferson Avenue – the area in which Warr was arrested on May 1, 2013, Warr's criminal history, his prior substance abuse history, and his activities on May 1, 2013, before the officers arrived in the area. Each of these rulings and the relevant trial evidence and proceedings relating thereto is addressed below.

A.     **History of Jefferson Avenue**

Plaintiffs' *in limine* motions sought to preclude testimony from Sherman Hardy ("Hardy"), the President of the Jefferson Avenue Business Association, whom defendants sought to call to testify about the "crime impacting business and residents on the 500 Block of Jefferson Avenue" (Docket # 124 at 4), and documentary evidence of calls for police services in that area between 2012 and 2013 (Docket # 125 (proposed exhibit 414)). (Docket # 127). Defendants argued that such evidence was relevant to the issue of probable cause to arrest Warr. (Docket # 126-1 at 7-8). Warr disagreed and maintained that such evidence would be unduly prejudicial. (Docket ## 127-10 at 4-5, 14; 129-11 at 9-11).

With respect to these disputes, the Court ruled that evidence concerning calls for service or history of vice activity on Jefferson Avenue was relevant to the extent that such information was within the arresting officers' knowledge at the time of Warr's arrest and in order to explain the purpose of the RPD's "Clearing the Block" policy, a strategy of dispersing groups of people gathered in areas of the city with higher incidences of drug and vice activity. (Tr. A 1017-18; Docket ## 133 at 2-3; 175 at 13-21; 177 at 10). The Court ruled that such evidence was not admissible as evidence of Warr's character or his involvement with or propensity to engage in criminal or vice activity and indicated that it was prepared to provide an appropriate

limiting instruction to the jury. (Docket ## 133 at 2-3; 175 at 13-21). The Court further ruled that Hardy could not testify unless Warr opened the door to his testimony by eliciting contrary testimony.[6] (Docket ## 133 at 2-3; 175 at 20-21).

Defendants' opening statement contained remarks by Ash that drugs and violence were prevalent in the area of the 500 block of Jefferson Avenue. (Tr. A 33-34). Ferrigno testified that members of law enforcement considered the area dangerous to patrol because of the level of violence and hostility to police in the area and that some officers referred to it as "angry town." (Tr. A 1141). Stewart also testified that the 500 block of Jefferson Avenue was "a well-known and well-documented narcotics area where drug sales are prevalent." (Tr. A 1304). In summation, Ash referred to "grown men hanging in alleys and on sidewalks contributing to crime and blight in that community." (Tr. B 56).

After Ferrigno and Liberatore testified, the Court offered to read the following limiting instruction to the jury:

> You have heard evidence that the area of Jefferson Avenue
> and Bartlett Street was known to law enforcement officers
> as a high crime area and that there were many calls for
> police service to that area. You may consider such
> evidence, if you find it credible, in evaluating whether there
> was probable cause to arrest Mr. Warr. You may not
> consider it as evidence that Mr. Warr was involved in such
> criminal activity[,] including drug offenses[,] and there is
> no evidence in the record that he was.

---

[6] The Court cautioned Ash before trial:

> [I]f you think there has been a door-opening situation, of course I may or I may
> not agree with you, and I would direct you to let me know in advance before you
> pose any questions so I can make that ruling outside the presence of the jury as
> to whether you can ask that question.

(Docket # 177 at 12).

(Tr. A 1300-01). Burkwit declined the Court's invitation to provide the limiting instruction. (Tr. A 1300-01).

## B. **Warr's Criminal History**

Plaintiffs also sought to preclude defendants from introducing evidence of Warr's criminal history, including arrests, convictions, and incarcerations, on the grounds that such evidence was inadmissible bad act evidence and/or unduly prejudicial. (Docket # 127-10 at 8-9). Defendants countered that Warr's criminal history was relevant to undermine his claim that he suffered significant emotional distress as a result of his May 1, 2013 arrest. (Docket ## 126-1 at 9-10; 128 at 4).

The Court determined to permit limited evidence of Warr's prior criminal history, namely, his prior felony conviction for Aggravated Unlicensed Operation of Motor Vehicle in the First Degree and "his prior arrest history and previous interactions with law enforcement officers (including the dates of arrest, but not the crime for which he was arrested, or whether he was convicted or served time in jail)." (Docket ## 133 at 2, ¶ 4; 133 at 3-4, ¶ 5; 175 at 21-34). The Court reasoned that Warr's felony conviction was admissible under Rule 609 of the Federal Rules of Evidence and that evidence of Warr's prior arrests and interactions with police were relevant to his claim that he suffered emotional injuries, including PTSD, as a result of the May 1, 2013 arrest. (*Id.*). The Court agreed with plaintiffs to exclude evidence that he had been imprisoned in view of the fact that he was not incarcerated as a result of the May 2013 arrest. (Docket # 175 at 31-32, 69). The Court further ruled that medical records and other documentary exhibits needed to be redacted to exclude references to tickets issued to Warr or to prior incarcerations. (Docket ## 133 at 3, ¶ 8; 175 at 69-70; 178 at 73, 75).

On two occasions during the trial, Ash published to the jury (on a projected screen) an unredacted exhibit (Defense Exhibit 19)[7] that referenced Warr's prior incarcerations. (Tr. A 682, 726). Burkwit objected, and both times the Court promptly instructed Ash to remove the exhibit from the jury's view. (Tr. A 682, 726). The first instance occurred during Ash's cross-examination of Ameduri. (Tr. A 682). After placing the exhibit on the projector, the following exchange occurred:

| ASH: | Let me just, let me just show you this note. It's marked as Defense Exhibit 19 and, again, I've highlighted for ease of use. |
| BURKWIT: | Objection, your Honor, this is, this is improper use. |
| COURT: | Take it off the screen. |
| BURKWIT: | I believe this note's not redacted. |
| COURT: | Okay. Take it off the screen. |
| ASH: | Sure. We just had – I'm sorry, your Honor. I don't know if you want to say anything. I don't want to interrupt you. |
| COURT: | No. That's supposed to be redacted and it was not redacted. Take it off the screen and move on. |

(Tr. A 682).

After Ameduri's testimony, the proceedings adjourned for the weekend. The following Monday, during Ash's cross-examination of the next witness, Kuttner, the following exchange occurred:

| ASH: | And, so, would it be relevant – and I'm showing you what's been marked as Defendant's Exhibit Number 19 – if in 2016, during your evaluation, he was taking a narcotic medication and he has in the highlighted area a history of being – |

---

[7] This exhibit subsequently was redacted and admitted into evidence. (Tr. A 1301-02, 1331-32).

| | |
|---|---|
| **BURKWIT**: | Objection, your Honor. Can Mr. Ash please remove this exhibit promptly. |
| **COURT**: | Pick it up. Move it. |
| **BURKWIT**: | Please remove it. May we approach. |
| **COURT**: | Let's set that aside. |
| **ASH**: | Sure. Would a history of being – |
| **COURT**: | And can you hand that up. |
| **ASH**: | Sure, your honor. This is the second time Mr. Burkwit's objected to this and I'm not sure what he's objecting to. |
| **COURT**: | I didn't ask for any comment. |
| **BURKWIT**: | Your Honor, left column. |
| **COURT**: | Go ahead. |

(Tr. A 726).

Ash continued to cross-examine Kuttner, one of plaintiffs' medical experts, and asked him whether he had considered Warr's prior arrests as previously experienced traumatic events. (Tr. A 740). He then asked Kuttner about "imprisonment," to which Burkwit immediately objected, and the Court sustained the objection to the uncompleted question and instructed the jury that they should disregard the question. (*Id.*).

At sidebar a few minutes later, the Court cautioned Ash about publishing exhibits that referenced Warr's incarcerations or asking witnesses about Warr's previous incarcerations, emphasizing that such conduct contravened the Court's *in limine* ruling. (Tr. A 743-44). The following exchange occurred:

| | |
|---|---|
| **COURT**: | Do not mention him being in jail. I have told you repeatedly and it's a violation of my order, okay. It was on that – |

> **BURKWIT**:  You –
>
> **COURT**:  Excuse me.  It's on the exhibit that you offered the other day in the left-hand column when Mr. Burkwit objects on the grounds that there's something there the jury shouldn't see.  You have no business putting it down on the machine again without talking to him about what it is and you're get –
>
> **ASH**:  See, I didn't see.
>
> **COURT**:  I don't care.  You've already put it down and you admitted that you put it on Friday and Mr. Burkwit said it shouldn't be there.  So don't put it down again in front of the jury.  I told you over and over again about mentioning jail and then you asked the question.  If you do it again, I am going to instruct the jury that you have directly violated my order.  Do you understand me, Mr. Ash.
>
> **ASH**:  I do understand, your Honor.

(Tr. A 744-45).

After Kuttner was excused, the Court took a recess.  (Tr. A 764).  At that time the following discussion with counsel occurred:

> **COURT**:  All right.  Mr. Ash, your question was inexcusable. It was in violation of what I ruled in in limine motions.  It is in violation of the written order that I issued following the rulings so there was no question about it, okay.
>
> I am warning you:  Anything else like that again, and I will instruct the jury that you have deliberately violated an order of the court.  All right.
>
> **ASH**:  Okay, your Honor.  Just for the record, because that is strong language and I apologize for offending the Court, my understanding is that with respect to damages, not the case in chief but when it comes to an expert talking about a psychological evaluation

12

and the effect of various traumas, my understanding was that this psychologist took a baseline of a 58-year-old man for a period of three years.  I think it is very prejudicial to my clients to not be able to discuss other life traumas.

| | |
|---|---|
| **COURT**: | Okay.  Mr. Ash, let me just interrupt you and say: We've had this argument.  This is the very argument that we had in the motions in limine. |
| | I said to you:  With respect to PTSD, emotional distress damages, that there were aspects of his life that you could examine with respect to damages, including, for example, prior arrests.  That is what is reflected in my order.  What we discussed was the fact that Mr. Warr was never imprisoned as a result of this.  That was not part of his claimed PTSD and I drew the line.  Okay. |
| **ASH**: | Agreed. |
| **COURT**: | I said, you know, number one – the transcript will speak for itself.  My recollection is that, number one, I wasn't sure it was relevant and, number two, to the extent that it was, references to prior jail time, I was excluding under 403.  All right. |
| | But, in any event, the very argument you're making now is an argument that I listened to, I listened to carefully, fairly, and I made a ruling. |
| | The ruling is reflected in my order and it is inexcusable to ask a question of that importance that violates the ruling.  I acknowledge you may disagree with the ruling but it is, of course, not any excuse to ask the question. |
| **ASH**: | I just wanted – just to be clear for the record, your Honor, I will be very, very, careful.  I do not want to upset the Court.  This case is too important to me and my clients. |
| | I asked him on cross was he aware of imprisonment, was he aware of it?  And plaintiff's counsel objected and I stopped it right there.  And then the next question kind of approached that subject.  But before we even got there, I went to the bench and I wanted to make sure I was good on that next exhibit. |
| | So, I will not even approach the area.  I didn't ask about specific imprisonment.  I wanted to know |

what the, the expert's baseline of knowledge was because it was clear to me that he had not analyzed the prior 50 years of Mr. Warr and in the context of a psychological evaluation, said in front of a jury with very, very stark conclusions –

COURT:       Okay.

ASH:         – I thought that was unacceptable.

COURT:       And a couple things.

Number one, we addressed it. Number two, the order says – and I'm reading from Page 2 of my very clear order document 133, specifically, "The Court rules as follows, number four, testimony or evidence concerning plaintiff Benny Warr's criminal history is limited to evidence of, one, Mr. Warr's single felony conviction for aggravated unlicensed operation of a motor vehicle in the first degree and, two, Mr. Warr's prior arrest history and interactions with law enforcement (the date of the arrest) but not the crime for which he was arrested or whether he was convicted or served time in jail." Okay.

I have said repeatedly if there is any question about opening the door or any ruling you need, you are to obtain that request and obtain that ruling before you come anywhere close to it.

ASH:         Your Honor, I apologize for that. Again, I just want to be very clear for the record. I just asked the doctor about –

COURT:       And I want to be clear: It is an absolute violation of my order. We're done.

Bring in the jury, please.

(Tr. A 764-68).

Later that afternoon, while cross-examining Nina Warr, Ash again asked a

question about Warr's prior incarcerations, prompting another immediate objection by Burkwit,

15

which was again sustained. (Tr. A 813). During the next break, the Court asked Burkwit

whether he would like the Court to issue a limiting instruction concerning counsel's improper

references to jail; he declined, preferring not to draw additional attention to the subject. (Tr. A

871).

C.   **Warr's History of Substance Abuse**

Plaintiffs' *in limine* motions also sought to preclude defendants from introducing

evidence of Warr's history of substance abuse. (Docket ## 127-10 at 5-8). They disputed the

relevance of such evidence, noting that Warr's medical records from the University of Rochester

suggested that he had been sober for years prior to the arrest. (*Id.*). Defendants disputed

plaintiffs' interpretation of those medical records and argued that they actually suggested recent

substance abuse. (Docket # 128 at 3). Following an evidentiary hearing, at which a physician

with the University of Rochester Medical Center was unable to resolve the disputed

interpretation of the conflicting notations in the medical records (Docket # 178), the Court

determined that the records were subject to differing interpretations and that the parties were free

to elicit testimony in support of their construction. (Tr. A 11-13; Docket ## 176 at 3-10; 178 at

66-75). The Court further determined that Warr's substance abuse history was relevant to "the

issue of causation of claimed cognitive injuries and damages for claimed cognitive injuries,

PTSD and emotional distress" and indicated that it would provide a limiting instruction to the

jury regarding that history. (Docket ## 133 at 2, ¶ 3; 4, ¶ 6; 178 at 75-82).

At trial, both parties introduced evidence and testimony regarding Warr's history

of substance abuse. On direct examination, Warr himself testified that he had a substance abuse

history, but that he had successfully completed a treatment program in 2011 and had not used

illicit drugs since that time. (Tr. A 241-42). He also testified that some of his medical records

erroneously suggested more recent substance abuse and that he had attempted to have his records amended to correct the error. (Tr. A 242-43). Ameduri also testified that the medical records reflected that Warr had a history of substance abuse for which he received treatment in 2011. (Tr. A 623-24). Ameduri further testified that Warr's medical records from 2013 and 2014 contained references to illicit drug use, but he believed such notations were erroneous. (Tr. A 648-49).

Ash questioned Kuttner at length regarding Warr's history of substance abuse and whether Kuttner had considered that history in his evaluation. (Tr. A 727-31). He also questioned Kuttner as to whether the medications that Warr took, including opioid medications such as Trazadone, Cymbalta and Gabapentin, could cause some of his reported symptoms, including difficulty sleeping and difficulty focusing. (Tr. A 751-53).

On two separate occasions, the Court instructed the jury as to the limited purpose for which they could consider Warr's drug use history. First, before Warr testified, the Court provided the following limiting instruction:

> You have heard evidence about drug use by Benny Warr. There is no evidence that Mr. Warr used drugs or was under the influence of drugs on May 1, 2013. Such evidence[,] that is drug use evidence, is being admitted for a limited purpose only. You may consider such evidence to the extent you find it credible only on the issues of evaluating, [(1)] Mr. Warr's claim that the defendants' actions on May 1, 2013, caused cognitive injuries to him and, [(2)], plaintiffs' claims of damages[,] including emotional distress, post-traumatic stress disorder and damages relating to claimed cognitive impairments or injuries. You may not consider this evidence for any other purpose, including whether probable cause existed for Mr. Warr's arrest or whether the force used by the defendants during the arrest was reasonable.

(Tr. A 231-32). The Court repeated the instruction after Ameduri's testimony. (Tr. A 698-99).

## D.    Warr's Pre-Arrest Activity

The *in limine* motions also addressed the parties' dispute as to the permissible temporal scope of the video footage of Warr's activity on Jefferson Avenue on May 1, 2013. Defendants sought to introduce the footage of Warr's presence in the area during the hours before the arresting officers arrived on scene.  (Docket ## 126-1 at 6-7; 128 at 5-6).  Defendants reasoned that such evidence refuted Warr's contention that he intended to catch a bus there that evening.  (*Id.*).  Warr sought to preclude footage prior to approximately 8:04 p.m., when the video first captured the officers' patrol vehicle on Jefferson Avenue, on the theory that Warr's presence in the area before the officers arrived was not relevant.  (Docket ## 127-10 at 15-16; 129-11 at 9).

The Court determined to permit defendants to introduce video evidence depicting Warr's activities upon and following the officers' arrival on Jefferson Avenue, but to preclude them from offering evidence of Warr's activities prior to that time unless they had evidence that the arresting officers knew or were made aware of his earlier presence or activities there or unless Warr somehow opened the door to that testimony.  (Tr. A 1149-50; Docket ## 133 at 3, ¶¶ 3, 7; 175 at 9-13).  At the time the parties argued and the Court ruled on the motions *in limine*, defendants were unable to point to any evidence that they were aware of what Warr was doing before they arrived at approximately 8:00 p.m.  (Docket # 175 at 9-13).  The Court further directed the parties to confer to agree on the time the officers arrived on the scene and to cooperate to stipulate to the use of one exhibit depicting the blue light video beginning at that time. [8]  (*Id.* at 11).

---

[8]  To the extent that defendants may suggest that the Court ruled that they could not offer any video evidence before approximately 8:00 p.m., that is a misconstruction of the Court's ruling.  First, the Court never directed that the footage begin at a particular time.  Second, in resolving the *in limine* motions, the Court never ruled that defendants could not offer evidence, video or otherwise, relating to Warr's activities before the officers arrived

During the trial, Warr offered into evidence Plaintiffs' Exhibit 2, a copy of the blue light video footage from the period 8:04:40 p.m. through 8:51:50 p.m. (Tr. A 50-51). Plaintiffs' Exhibit 2 was repeatedly shown to the jury during the testimony of various witnesses throughout the trial. (*See*, *e.g.*, Tr. A 50-54, 247, 253, 375-76, 439-40, 479, 826). During Ash's direct examination of Ferrigno, however, Ash displayed blue light video that he identified as Plaintiffs' Exhibit 2; in actuality, he displayed blue light footage contained on a USB drive that had neither been marked nor admitted into evidence. (Tr. A 1150-51, 1154-61). The fact that the footage he displayed was an unmarked exhibit that had not been received into evidence was discovered when Ash, in his purported attempt to navigate to a particular frame of the footage, momentarily displayed footage from much earlier in the day. (*Id.*). The footage was from approximately 4:00 p.m. and appeared to depict Warr in the same vicinity as his later encounter with the officers. (*Id.*). Burkwit objected, the jury was excused, the Court strongly admonished Ash that he was not permitted to show evidence to the jury that was not marked, received into evidence, or reviewed by the Court. (*Id.*). When the jury returned, the Court instructed, "The video that you saw was not a video that was in evidence and so you should disregard anything that you saw on that video. We're going to use the one that's in evidence." (Tr. A 1161).

At the next break, the Court directed Ash to immediately surrender the flash drive to the Court for *in camera* inspection, which the Court conducted during the break.[9] (Tr. A

---

on scene. The Court consistently ruled that such evidence would be relevant and admissible only if defendants could show the arresting officers knew about those activities, in which case the evidence would be relevant to probable cause for Warr's arrest. (Docket # 175 at 4-13). Defendants never made such a proffer in connection with the motions.

[9] The precise exchange was as follows:

> **COURT**: Mr. Ash, if I could have that flash drive and I could take a look at it.

1198). After the jury was excused for the day, the Court returned to the subject of the video that

Ash displayed. (Tr. A 1341). Ash proffered that his display of any footage prior to 8:04 p.m.

was inadvertent. (Tr. A 1342). Burkwit placed on the record that the footage he saw appeared to

show an individual handing something to Warr. (*Id.*). The Court explained that its review of the

footage contained on the flash drive revealed that it contained portions of blue light video from

May 1, 2013 that began around 3:00 p.m. and ended after Warr's arrest, although there were

significant gaps in the footage. (Tr. A 1341). According to the Court, the footage did not appear

to contain any still pictures of Warr; rather, it appeared to consist of a compilation of clips of the

blue light footage depicting Warr.[10] (*Id.*).

| | | |
|---|---|---|
| **ASH**: | | Your Honor, I have other client files on this flash drive, as well. |
| **COURT**: | | Okay, I won't look at the other client files. Thank you. See you in 10 or 15. |
| **ASH**: | | Your Honor, I just also want to note that on that flash drive are not only client files but there are personal files on there for my personal business. |
| **COURT**: | | If you want to tell me how to access what it is you played, you can do that. |
| **ASH**: | | Well, can I look and and just so I can tell you exactly where to look. Thank you. |

(Tr. A 1198).

[10] At the time, the Court carefully reviewed the footage contained on the USB drive and did not see any hand-to-hand transactions or anything suggestive of such conduct depicted.

The Court explained:

All right. Now, with respect to the flash [d]rive. I have reviewed the file that Mr. Ash indicated to [M]iss Cornetta that he played this morning. And, you know, my review of that file is that it contains portions of the blue light video from May 1, 2013, you know, several of which begin prior to the – to Exhibit 2.

I, in my review of that, of that footage, I didn't see any still, still pictures of Mr. Warr, I mean, it seems to be portions in chronological order, although there are – my guess is that it's probably, probably footage that depicts Mr. Warr so, you know, there are significant gaps in time in the footage. But I didn't see any, I didn't see any still photographs. It seems to be start from 3 something and it

The Court directed Burkwit to consider whether plaintiffs wished the Court to provide an additional curative instruction to the jury and to advise the Court the following day. (Tr. A 1343). The following day, Burkwit did not request any additional instructions regarding the footage.

## III.     Verdict and Special Interrogatories

After summations, the jury was provided with a verdict form on which to record their verdict as to the claims against Liberatore, Ferrigno, and Stewart. (Docket # 148). The jury found that Warr failed to establish that he had been unlawfully arrested for disorderly conduct or that Liberatore, Ferrigno or Stewart had committed the torts of assault or battery against him. (*Id.* at ¶¶ 1-2, 6-11). The jury also found that Warr had not established that Ferrigno or Stewart had subjected him to excessive force during his arrest. (*Id.* at ¶¶ 3, 5). With respect to Liberatore, however, the jury found that he had subjected Warr to excessive force in violation of the Fourth Amendment. (*Id.* at ¶ 4). The jury awarded Warr nominal damages of $1.00, but no compensatory damages. (*Id.* at ¶¶ 12-13). The jury answered "yes" to the question, "do you find that punitive damages should be awarded against [Liberatore] for the . . . claim[] [of] [e]xcessive [f]orce," but, in response to a subsequent question, determined that the amount of punitive damages to be awarded was $0.00. (*Id.* at ¶ 16).

After the verdict, Liberatore moved for judgment as a matter of law on the basis of qualified immunity. (Tr. A 1575). In accordance with the procedure set forth in *Stephenson v. Doe*, 332 F.3d 68, 80-81 (2d Cir. 2003), and with input from the parties, the jury was directed

---

ends at 8 something. This particular footage (indicating) was not designated, to my knowledge, by any number. It wasn't, it wasn't offered. We've gone through that, that's not the right procedure. We should have used Plaintiff's Exhibit 2.

(Tr. A 1341).

to deliberate upon and answer a set of written special interrogatories (the "Special Interrogatories"). (Docket # 148-1).

As reflected in their responses to the Special Interrogatories, the jury found that Warr resisted arrest while he was seated in his wheelchair by flailing his arms, but that he did not ever strike Ferrigno or Liberatore (contrary to Ferrigno's testimony that Warr struck him). (*Id.* at ¶ 3). The jury also found that Liberatore and Ferrigno attempted to use other force techniques before turning over Warr's wheelchair, including grabbing his arms.[11] (*Id.* at ¶ 4). The jury concluded that members of the public did not yell at the officers before Warr's wheelchair was turned over and that Liberatore did not reasonably fear for his safety at that time. (*Id.* at ¶¶ 1-2).

The jury further determined that after Warr's wheelchair was overturned, a crowd or public disturbance was present in the vicinity, which included members of the public who were yelling at the officers, and that Liberatore reasonably feared for his safety at that time. (*Id.* at ¶¶ 5-7). The jury found that Warr continued to resist arrest while he was on the ground, but that he did not flail his arms or tuck his hands under his body (contrary to Liberatore's and Ferrigno's testimony). (*Id.* at ¶ 8). Finally, the jury concluded that the officers did not use any force on Warr after he was handcuffed. (*Id.* at ¶ 9).

IV. **The Pending Motion**

Immediately after the jury's verdict was rendered, plaintiffs moved for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, maintaining that the verdict was inconsistent, against the weight of the evidence, and a miscarriage of justice. (Tr. A 1573). The Court directed briefing on the motion. (*Id.*). On March 4, 2019, Warr filed the pending motion

---

[11] The trial testimony was undisputed that Ferrigno deployed a burst of pepper spray while Warr was in his wheelchair and employed knee strikes to his abdomen when Warr was on the ground before he was handcuffed.

seeking to set aside the verdict and for sanctions, which was unaccompanied by a transcript of the relevant proceedings. (Docket # 158). After reviewing the parties' submissions, the Court directed plaintiffs to "supplement their post-trial motion with an amended affidavit and memorandum of law supported by specific citations to the trial record and accompanied by the trial transcript." (Docket # 166). Plaintiffs complied with the Court's Order by filing a supplemental submission on October 29, 2019. (Docket # 170). Plaintiffs' request for a new trial is premised on two grounds: first, that Ash engaged in deliberate misconduct that prejudiced their right to a fair trial; and second, that the jury's verdict awarding no compensatory or punitive damages was inconsistent with its finding of liability against Liberatore and against the weight of the evidence. (Docket # 170-18).

On March 3, 2020, this Court issued an Order to Show Cause, identifying Rule 16(f) of the Federal Rules of Civil Procedure as a potential source for sanctions and providing defendants an opportunity to supplement their papers, if desired, to explain why sanctions would not be warranted pursuant to Rule 16(f) for counsel's violations of the Court's *in limine* rulings during the trial. (Docket # 172). Defendants responded on March 12, 2020, maintaining that sanctions would be inappropriate under the rule.[12] (Docket # 173).

## DISCUSSION

Pursuant to Rule 59, a "court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits,

---

[12] The following day, defendants filed a corrected version of the submission. (Docket # 174).

or otherwise taking a second bite at the apple." *Kogut v. Cty. of Nassau*, 2013 WL 3820826, *2 (E.D.N.Y. 2013) (internal quotation omitted), *aff'd in part*, 789 F.3d 36 (2d Cir. 2015). Accordingly, "[o]n a motion for a new trial, the moving party bears [a] heavy burden." *Manes v. Metro-North Commuter R.R.*, 801 F. Supp. 954, 956 (D. Conn. 1992), *aff'd*, 990 F.2d 622 (2d Cir. 1993).

Whether to grant a new trial "is committed to the discretion of the trial judge," *Snyder v. Shenendehowa Cent. Sch. Dist.*, 2011 WL 705151, *3 (N.D.N.Y. 2011), *aff'd*, 486 F. App'x 176 (2d Cir.), *cert. denied*, 133 S. Ct. 653 (2012), and the trial judge "has significant discretion in deciding whether to grant a Rule 59 motion for a new trial," *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 425 (S.D.N.Y. 2008). "Despite this liberality, however, [a] court should only grant a new trial when a jury's verdict is egregious." *Kogut v. Cty. of Nassau*, 2013 WL 3820826 at *2 (internal quotation omitted) (alteration in original). Thus, a court should not grant a new trial "unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988).

I. **Inconsistent Verdict/Weight of the Evidence**

Whether styled as a challenge to the consistency or to the evidentiary weight of the verdict, the crux of Warr's argument to set aside the verdict is based upon the jury's twin determinations that Warr was subject to excessive force but entitled to nominal damages only.[13]

---

[13] Warr maintains that the jury's conclusion that no battery occurred despite finding that Liberatore engaged in excessive force is inconsistent. (Docket ## 170 at ¶ 417; 170-18 at 16). I reject this position as meritless given the legal authority to the contrary. *See Brim v. City of New York*, 2016 WL 11263170, *3 (E.D.N.Y. 2016) ("a reasonable jury could have found in favor of [the officer] with regard to the assault and battery claims but for [plaintiff] on the use of excessive force[;] . . . the jury charge for both [assault and battery] . . . required a finding of intent, which is not required for excessive force"), *report and recommendation adopted by*, 2017 WL 2445046 (E.D.N.Y. 2017). Similarly, Warr suggests, without discussion or citation to legal authority, that the jury's

(Docket ## 170 at ¶¶ 404-19; 170-18 at 16-19). Warr maintains that because he was indisputably injured as a result of his May 1, 2013 arrest, and because the jury concluded that Liberatore used excessive force during that arrest, he is entitled to compensatory damages. (Docket # 170-18 at 16-19). Warr's position is unsupported by the law, which requires the court to "examine the record to determine whether it is possible to harmonize the jury's verdict." *Ali v. Kipp*, 891 F.3d 59, 65 (2d Cir. 2018). Because there is such a view of the evidence in this case, Warr's motion should be denied.

A finding in a plaintiff's favor that he "has been deprived of a constitutional right does not automatically entitle him to a substantial award of damages." *Kerman v. City of New York*, 374 F.3d 93, 123 (2d Cir. 2004). This is particularly true where the right at issue is an individual's right to be free from excessive force. *See Ali v. Kipp*, 891 F.3d at 65 ("a jury finding of excessive force does not automatically entitle a claimant to compensatory damages as a matter of law") (quoting *Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d 311, 314 (2d Cir. 1999)). Rather, a jury may conclude that "compensatory damages are inappropriate even where excessive force was used." *Amato v. City of Saratoga Springs, N.Y.*, 170 F.3d at 314. Those determinations may arise where "a plaintiff's testimony as to his injuries lacks objective support or credibility, or where both justified force and unjustified force were used, either of which could have caused his injuries, or where some of the plaintiff's injuries could have been caused by a

---

conclusion that punitive damages were warranted but no sum awarded renders the verdict inconsistent. (Docket ## 170 at ¶ 417; 170-18 at 16). As I instructed the jury, the award of punitive damages was entirely discretionary in the event they found that the defendant's – in this case Liberatore's – conduct was malicious or wanton. (Tr. A 1495-98). Similarly, the jury was instructed that the amount of punitive damages to be awarded was likewise entirely discretionary; among the factors they were instructed to consider were the degree to which the particular defendant should be punished, the degree to which the defendant may be adequately punished by an award of actual damages only, and the degree to which an award would deter that defendant or others like him from similar conduct in the future. (Tr. A 1495-98). Given the discretion afforded the jury with respect to punitive damages, and in the absence of legal authority supporting plaintiffs' position, I likewise reject it as meritless.

codefendant who was not found to have used excessive force." *Kerman v. City of New York*, 374 F.3d at 123.

As an initial matter, although plaintiff's testimony that he suffered injuries during his arrest was generally supported by expert testimony introduced at trial, the opinions of those experts relied upon, among other things, Warr's own subjective reports of his symptoms, with little supporting objective evidence. Indeed, the medical records and imaging conducted after the arrest did not conclusively demonstrate that Warr suffered any acute injuries during the encounter.[14] (Tr. A 428-29, 431-32, 489). In addition, several of the medical experts acknowledged that their evaluations of Warr depended in large part upon his subjective complaints of his symptoms. (Tr. A 429, 641, 681, 724-25, 758). The jury was entitled to, and indeed obligated to, weigh the medical evidence and consider the credibility of Warr's claimed injuries.[15] *See Amato*, 170 F.3d at 315 ("the jury could have reasonably been swayed by the cross-examination of the[] doctors[;] . . . [t]o the extent that the jury may have believed [plaintiff] was malingering, they could have refused to credit the testimony of doctors who relied on [plaintiff's] subjective account of his symptoms"); *Toliver v. N.Y.C. Dep't of Corrs.*, 202 F. Supp. 3d 328, 340 (S.D.N.Y. 2016) ("[p]ut simply, the jury could have found [p]laintiff's testimony regarding his injuries to be wildly exaggerated and unworthy of belief . . . and yet still

---

[14] Warr's submission contains several misstatements concerning the evidence that was introduced regarding his claimed injuries. For instance, he states that both Ameduri and Molinari agreed that the medical records demonstrated that he suffered three left-sided rib fractures as a result of the incident. (Docket # 170-18 at 18). To the contrary, Molinari testified that the radiology report suggested that the rib fractures were pre-existing. (Tr. A 470). Similarly, Warr maintains that no medical expert testified that he did not suffer from memory loss or cognitive impairments as a result of the May 1, 2013 incident. (Docket # 170-18 at 18). To the contrary, Benedict testified that he did not find evidence that Warr suffered from either as a result of the incident. (Tr. A 430, 433, 446, 449, 451, 453).

[15] Warr's challenge rests largely on the mistaken assumption that where a party fails to introduce contradictory evidence regarding any specific claimed injury, such injury is therefore established as a matter of law. (Docket # 170-18 at 18-19).

26

have found [defendant's] use of pepper spray was unjustified and malicious"); *Hyppolite v. Collins*, 2015 WL 2179772, *3-4 (D. Conn. 2015) ("the jury could have readily found [p]laintiff's testimony as to his alleged injuries, or the extent of any injuries, not to be credible[;] . . . [i]t was in the province of the jury to make a credibility determination").

In any event, even assuming that Warr had demonstrated that he suffered injuries caused by the May 1, 2013 arrest, he has not proved that those injuries were caused by *Liberatore's* use of excessive force. *See Haywood v. Koehler*, 885 F. Supp. 624, 626-27 (S.D.N.Y. 1995) ("the fact that the plaintiff was undeniably injured does not mean that each or any of the plaintiff's injuries was caused by an unconstitutional use of excessive force"), *aff'd*, 78 F.3d 101 (2d Cir. 1996). Rather, the verdicts in favor of Ferrigno and Stewart, each of whom indisputably applied some degree of force against Warr, reflect the jury's determination that the arrest involved the use of both justified and unjustified force. Further, the evidence at trial demonstrated that Liberatore participated in at least two discrete acts of force during the arrest of Warr, either of which the jury could have concluded was justified. Under such circumstances, it is entirely possible that a reasonable jury could have concluded that Warr "did not suffer even a minor compensable injury proximately caused by [Liberatore's] use of excessive force." *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994); *see Haywood v. Koehler*, 885 F. Supp. at 627 ("[t]he fact that [plaintiff] was injured during the events surrounding [defendant's] use of excessive force does not in any way satisfy plaintiff's burden of proving that the use of excessive force caused him injury, nor does it shift that burden to the defendant").

As explained above, the evidence established the use of several discrete acts of force against Warr during the course of the encounter, including Ferrigno's use of pepper spray, Liberatore's act of pushing over the wheelchair, Ferrigno's application of knee strikes to Warr's

abdomen, Stewart's intervention to assist in handcuffing Warr, and Liberatore's elbow strike to Warr's head. The jury's verdict reflects their determination that Ferrigno was justified in deploying pepper spray and administering knee strikes and that Stewart was justified in his actions. Moreover, the verdict against Liberatore reflects only their determination that he used excessive force; it does not reveal whether they concluded that Liberatore was justified in toppling the wheelchair, but not in delivering the elbow strike, or vice versa, or in doing neither. Under these circumstances, the jury may have concluded that Warr demonstrated that he suffered compensable injuries, but that the injuries were caused solely by Ferrigno and Stewart, or may have concluded that Liberatore also caused or contributed to the injuries but only through the use of justified force. *See Gibeau v. Nellis*, 18 F.3d at 110 ("[plaintiff] was struck by [defendant] approximately three times[;] [i]t is possible that the jury considered only the last blow to be excessive, and it may have concluded that the [injury] was caused by the first blow"); *Haywood*, 885 F. Supp. at 627 ("[t]he jury could have concluded, consistent with the weight of the evidence, that the force used against [plaintiff] that caused his injuries . . . was caused by a justifiable and not an excessive use of force").

      For instance, the jury may have determined that the only act of excessive force was Liberatore's elbow strike to the head and that the remaining force employed during the arrest of Warr was justified. Under this scenario, the jury may have attributed any claimed injuries that they found were proven – including three fractured ribs, aggravation of his residual limb, exacerbation to his chronic back pain, a neck injury, a traumatic brain injury, and post-traumatic stress disorder – to the justified combination of the use of the pepper spray, the toppling of the wheelchair, which several witnesses testified caused Warr's left-side and head to strike the concrete ground (Tr. A 66, 199, 258-59, 565), the abdominal knee strikes, and the

handcuffing. Indeed, nothing in the record demonstrates that the injuries that could be attributable to the elbow strike could not have been attributable to Warr hitting his head on the ground as he fell from his chair – a head impact that occurred prior to the elbow strike. Accordingly, the jury could have concluded that "the primary injury [to Warr] had already occurred, [and] the subsequent [elbow strike], while excessive, did not produce any compensable injury." *See Haywood*, 885 F. Supp. at 627 ("the jury reasonably concluded that there was excessive force but that no compensable injuries were caused by the use of such force"); *Kerman*, 374 F.3d at 124 (plaintiff was not entitled to compensatory damages as a matter of law; "the jury could permissibly have concluded that any adverse mental, emotional, or psychological effects" plaintiff experienced during the incident occurred prior to the use of excessive force and that plaintiff "suffered no more than minimal psychic or emotional damage" as a result of the unjustified use of force); *Gibeau*, 18 F.3d at 110 (because the trial proof included evidence that plaintiff was in an earlier physical altercation with another officer and that the defendant officer engaged in multiple uses of force, "a reasonable jury could have concluded that [plaintiff] did not suffer even a minor compensable injury proximately caused by [defendant's] use of excessive force"); *Alvarez v. City of New York*, 2017 WL 1506563, *2 (S.D.N.Y.) ("[g]iven the volume of gunshot wounds inflicted on [plaintiff], it would not be seriously erroneous for the jury to conclude that [plaintiff's] pain and suffering resulted from earlier, justified rounds of bullets that struck him, rather than later, unjustified rounds"), *reconsidered in part on other grounds*, 2017 WL 6033425 (S.D.N.Y. 2017).

In sum, because a view of the evidence exists that harmonizes the jury's finding of excessive force with their conclusion that Warr did not suffer compensatory damages, Warr is not entitled to a new trial on this ground. *See Ali*, 891 F.3d at 66 (district court did not abuse its

discretion in denying plaintiff's motion for a new trial where it was possible that the jury concluded that the injuries suffered by plaintiff were not caused by the excessive force); *Kerman*, 374 F.3d at 124 ("we cannot conclude that [plaintiff] was entitled as a matter of law to compensatory damages on the basis of his claims of physical pain, medical expenses, emotional suffering, and psychological injuries"); *Girbes-Pierce v. City of New York*, 2019 WL 1522631, *11 (S.D.N.Y.) ("there is a path by which the jury could have arrived at an award of only nominal damages[;] . . .[t]here is thus no basis to upset the jury's award of $1.00 in nominal damages"), *appeal filed*, No. 19-1320 (2d Cir. 2019); *Alvarez v. City of New York*, 2017 WL 1506563 at *3 ("[g]iven the multiple reasonable paths by which the jury could have arrived at an award of nominal damages, their decision to do so was neither seriously erroneous nor a miscarriage of justice").

## II.    **Defendants' Counsel's Conduct**

Over the course of approximately 86 paragraphs in their counsel's post-trial affidavit, plaintiffs describe alleged misconduct engaged in by defense counsel throughout the trial that plaintiffs contend justifies a new trial.  (Docket # 170 at ¶¶ 297-383).  The complained-of misconduct generally falls into one of two categories: (1) violations of this Court's pretrial *in limine* rulings excluding or limiting admission of certain evidence, and (2) "inflammatory comments" made throughout the course of the trial, especially during defendants' opening and closing statements.[16]  (Docket ## 170 at 297-383; 170-18 at 5-16).

---

[16]  In many instances, the specific nature of plaintiffs' objections to counsel's statements in opening and closing arguments are difficult to discern.  Many of the paragraphs in plaintiffs' counsel's affidavit simply provide background information (*see, e.g.*, Docket # 170 at ¶¶ 297, 319, 323-28, 335-36, 344, 348-49, 351, 353-54, 356-65); others clearly identify the objection or otherwise make it discernable by the Court (*see, e.g.*, *id.* at ¶¶ 298-302, 304-06, 309-15, 317-18, 320-22, 329-34, 337-43, 346-47, 350, 352, 355, 366-67, 369, 371, 373-83); still others raise objections to the propriety of Ash's conduct without explaining the reason why they believe it amounts to misconduct (*see, e.g.*, *id.* at ¶¶ 303, 307-08, 316, 345, 368, 370, 372).

Having presided over the eleven-day trial, including intervening where appropriate to manage the proceedings, admonish counsel, and deliver curative instructions, I have little trouble concluding – and indeed the transcript demonstrates – that Ash engaged in conduct that violated my *in limine* orders and resorted to rhetoric and argument that was inflammatory and inappropriate. The salient question from the record is whether that misconduct, judged in the context of the trial as a whole, unduly prejudiced plaintiffs so as to deprive them of a fair trial. I find that it did not.

The trial judge, "who was present throughout the trial[,] is best able to determine the effect of the conduct of counsel on the jury," *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1289 (2d Cir.) (brackets and quotations omitted), *cert. denied*, 498 U.S. 920 (1990), and has broad discretion to determine whether the "conduct of counsel is so improper as to warrant a new trial," *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (quoting *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989)). In exercising that discretion, the court must determine "whether counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury." *Golden v. OSG Ship Mgmt., Inc.*, 2018 WL 9945199, *8 (S.D.N.Y. 2018) (internal quotations omitted). Misconduct by trial counsel will not necessarily taint a verdict to such a degree as to warrant a new trial; rather, the court should consider the claimed misconduct "in the context of the trial as a whole, examining among other things, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, and the manner in which the parties and the court treated the comments." *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d at 429 (internal quotation and brackets omitted). A new trial is justified only when the court concludes that "the

conduct of counsel . . . causes prejudice to the opposing party and unfairly influences a jury's verdict." *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992).

### A. Violations of Evidentiary Rulings

Plaintiffs contend that during the course of the trial, Ash violated several of the Court's evidentiary *in limine* rulings, including its determinations to exclude evidence concerning Warr's activities prior to the officers' arrival on the scene and his prior incarcerations and to limit evidence concerning Warr's substance abuse history and the incidence of criminal activity in the neighborhood where Warr was arrested. (Docket ## 170 at ¶¶ 299, 300-02, 322, 331-33, 337-40, 343, 346, 347, 350, 355, 366; 170-18 at 5-16). These violations, plaintiffs maintain, presented an unduly prejudicial characterization of Warr to the jury warranting a new trial. For the reasons discussed below, I disagree.

### 1. Evidence that Jefferson Avenue was a High Crime Area and Evidence of Warr's Substance Abuse History

Contrary to plaintiffs' contentions, Ash did not "grossly abuse[]" the *in limine* rulings concerning the admissibility of Warr's prior substance abuse or the officers' knowledge that the Jefferson Avenue area was a "high crime" area. (Docket ## 170 at ¶¶ 299, 300, 366, 337-40, 343; 170-18 at 11-13). Although plaintiffs argue that Ash prejudicially characterized the Jefferson Avenue neighborhood during his opening and closing statements and improperly elicited testimony concerning the officers' knowledge of the neighborhood (Docket # 170 at ¶¶ 299-300, 366; Tr. A 33-34, 1141, 1304), evidence concerning the "high crime" area of Warr's arrest was relevant and admissible. As this Court had ruled prior to trial, to the extent that the arresting officers knew that the Jefferson Avenue area had a higher incidence of criminal activity than other areas in the city, that evidence was permissible for the jury to consider as relevant to the determination whether probable cause supported Warr's arrest for disorderly conduct, as well

as to explain the officers' conduct on patrol in the neighborhood. (Docket # 133). Defendants testified that they were aware that the vicinity in which Warr was arrested was a high crime area. (Tr. A 1141, 1304). The Court offered to provide a limiting instruction to the jury explaining the limited purpose for which this evidence was admitted and could be considered. (Tr. A 1300-01). The specific text of the declined instruction is set forth *supra* at 8. (*Id.*).

Similarly, although plaintiffs complain that Ash cross-examined Kuttner at length concerning whether he had considered Warr's substance abuse history during his evaluation (Docket # 170 at ¶¶ 337-40, 343), counsel's examination and questions in this respect complied with my *in limine* ruling that Ash was permitted to elicit evidence of Warr's substance abuse history for the limited purpose of refuting or undermining the causation or scope of his claimed cognitive and emotional injuries. (Docket # 133). Kuttner provided expert testimony for plaintiffs regarding Warr's mental health impairments and opined that they were caused by the May 1, 2013 arrest; thus, Ash was within the scope of the Court's *in limine* ruling in cross-examining Kuttner regarding Warr's prior drug use. Moreover, the Court gave a limiting instruction to the jury, which was repeated later during the trial directing them that Warr's substance abuse history could be considered only in connection with Warr's claims for cognitive injuries or emotional damages. (Tr. A 231-32, 698-99). In sum, the trial record does not demonstrate that defendants' counsel's conduct violated these two evidentiary rulings.

## 2. Evidence of Warr's Activities Earlier in the Day of His Arrest and Evidence of Warr's Prior Incarcerations

By contrast, the record demonstrates that Ash violated the Court's *in limine* rulings regarding evidence of Warr's activities on May 1, 2013, prior to the officers' arrival on scene and his previous incarcerations. While counsel's violative conduct was inexcusable, the

record simply does not establish that it so prejudiced Warr or influenced the jury as to warrant a new trial.

Regarding the order precluding evidence of Warr's activities in the Jefferson Avenue area before the officers' arrival on scene, the record shows that Ash violated that ruling on two occasions and would have done so on two other occasions had the Court not intervened. (Docket # 170 at ¶¶ 299, 301, 322, 355). Turning first to the near violations, the first occurred during defendants' opening statement. In addressing Warr's conduct on May 1, 2013, Ash stated, "he had been in that same location, the evidence will show – "; at that point, Burkwit objected, the Court sustained the objection, and Ash did not complete the statement. (Tr. A 35-36). Similarly, during cross-examination of Warr, Ash asked Warr how long he had been on Jefferson Avenue before he was arrested. (Tr. A 300-01). Once again, Burkwit objected, and the Court sustained the objection; before the objection, however, Warr responded that he did not know. In the first instance, the jury did not hear the evidence that Ash intended to preview, and they were advised both before opening statements and in the Court's final jury instructions that counsel's questions or statements are not evidence. In the second instance, although Warr answered, his vague answer that he did not know how long he had been in the area before his arrest did not pose any meaningful risk of prejudice.

With respect to the two actual violations, the first occurred in counsel's opening statement and the second occurred during his direct examination of Ferrigno. In opening, Ash commented that Warr had the "strength and the stamina to hang out all day long" in the high crime area of Jefferson Avenue, referring to the day of his arrest. (Tr. A 34). He made the statement in the context of a comparison between the defendant officers' patrol duties that day and Warr's idle activities. (*Id.*). The second violation occurred in the course of Ash's direct

examination of Ferrigno when he displayed the blue light camera footage from approximately four hours prior to the arrest, which is described more fully *supra*.[17]  (Tr. A 1150-51).

While I agree with plaintiffs that Ash violated the Court's preclusion order with respect to evidence of Warr's activities prior to the officers' arrival, I disagree that the violations resulted in undue prejudice requiring a new trial.  The video footage that was displayed to the jury was displayed very briefly.  (Tr. A 1342).  The Court's review of that footage outside the presence of the jury revealed no depiction of any illegal, illicit, or vice activities engaged in by Warr or anyone else; at most, the jury observed footage of Warr standing with a group of individuals.  (Tr. A 1341).  The Court promptly provided a curative instruction after the footage was displayed, directing the jury to disregard it, and in its instructions to the jury, the Court advised the jury that counsel's statements were not evidence.  (Tr. A 14, 19, 1161, 1458).  *See Greenbaum v. Handelsbanken, N.Y.*, 67 F. Supp. 2d 228, 273 (S.D.N.Y. 1999) ("[c]urative instructions are ordinarily sufficient to render counsel errors harmless").  On this record, I find that the brief mention of Warr "hanging out" and the brief display of footage of Warr from earlier in the day, considered in the context of the entire trial including the Court's instructions, did not deprive Warr of a fair trial.

I reach a similar conclusion with respect to Ash's repeated violations of my *in limine* order precluding evidence that Warr had previously been incarcerated.  As described *supra*, Ash twice published an exhibit to the jury that referenced Warr's prior incarcerations.  (Docket # 170 at ¶¶ 331-33).  The reference was contained in small print in a side column on the

---

[17] Ash contends that the door had been opened to evidence of Warr's pre-arrest activities.  (Docket # 171-1 at 11-12).  First, the testimony that he cites concerns the presence of Warr and Latham at the Swann building prior to the officers' arrival on scene, not their presence on Jefferson Avenue earlier in the day.  More importantly, that testimony was elicited by Ash, not by Burkwit.  As I explained to Ash during the trial, he himself could not open the door by eliciting testimony in contravention of my order.  (Tr. A 302).  Finally, as I repeatedly instructed, counsel was required to seek a confirmatory determination from the Court *prior* to eliciting evidence in the event that he believed that the door may have been opened by plaintiffs.  (Tr. A 608-09).

exhibit; when Ash displayed the record, he questioned the witnesses about other information on the exhibit; and, the exhibit was displayed for a very brief time before Ash was ordered to remove it. Under these circumstances, it is far from clear that the jury observed the notation. On two separate occasions Ash asked witnesses questions that suggested that Warr had previously spent time in prison. (*Id.* at ¶¶ 346, 350). Burkwit promptly objected, the Court sustained the objections and the witnesses did not answer the questions. The Court offered to provide a curative instruction to the jury, but Burkwit declined the offer.[18] (Tr. A 871). Considered against the entire trial record, which included the admission of evidence that Warr had been convicted of a felony and had been arrested multiple times and Court instructions to the jury that an attorney's questions are not evidence, the violations do not justify a new trial.[19] (Tr. A 14, 527). *See Lovejoy v. Gure-Perez*, 2014 WL 2459656, *3 (E.D.N.Y. 2014) (no prejudice where there was "no reasonable probability that the jury would have been influenced as a result of [the attorney's] misconduct[;] [opposing] counsel regularly and appropriately objected when [the attorney] asked improper questions, and the court sustained these objections or had the testimony stricken"); *Datskow v. Teledyne Cont'l Motors Aircraft Prods., a Div. of Teledyne Indus.,* 826 F. Supp. 677, 685 (W.D.N.Y. 1993) ("it is hardly uncommon for a jury to hear some reference to

---

[18] Additionally, during the Court's concluding instructions, the jury was told the following, among other instructions regarding credibility of witnesses:

> You have heard the testimony of witnesses who were previously convicted of a crime punishable by more than one year in jail. These prior convictions were put into evidence only for you to consider in evaluating the witness' credibility. You may consider the fact that the witness who testified is a convicted felon in deciding how much of his or her testimony to accept and what weight, if any, it should be given.

(Tr. A 1466).

[19] For similar reasons, I reject plaintiffs' contention that several other inflammatory questions posed by Ash (Docket # 170 at ¶¶ 320, 329, 334, 341), to which the Court sustained immediate objections, so prejudiced Warr or tainted the jury as to warrant a new trial.

inadmissible evidence[;] . . . in the context of the trial as a whole, the striking of this testimony

and the instruction to the jury not to consider it sufficiently cured any prejudice to defendants").

### B.   Ash's Statements to the Jury

I turn next to the allegedly inflammatory remarks made by Ash during

defendants' opening statements and summation.[20]   (Docket # 170 at ¶¶ 298, 304, 306, 309-15,

317-18, 369, 373-83).   "[W]hen 'arguing to a jury, counsel must properly have some latitude, so

long as prejudice does not appear.'"   *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955

F. Supp. 2d 118, 155 (E.D.N.Y. 2013) (quoting *Schwartz v. Nw. Airlines, Inc.*, 275 F.2d 846, 846

---

[20]   At the conclusion of the trial, prior to summations, the Court cautioned the parties' attorneys regarding their summations.  (Tr. B 17).  The following exchange occurred:

COURT:   I want to make as crystal clear as I possibly can before attorneys tread into arguments on summation, okay: I've made a lot of rulings about what can come in, what can come in for limited purposes and what can't come in.

If there is a reference to something that has been excluded, then that's likely to draw a pretty stern rebuke and curative instruction from the Court.

Similarly, if something is argued for a purpose other than the limited purpose for which I admitted it, I am going to instruct the jury that it is being used for an improper purpose and they have to disregard it.

If you have any questions about whether anything you intend to say, you know, is out of bounds or within bounds, I'm certainly happy to tell you that in advance.  I'm not interested in embarrassing anybody.  I'm not interested in, you know, I'm not interested in throwing you off your stride because you didn't realize that you were going to get that kind of ruling. But I am certainly very, very interested, as I have been from the outset, in doing everything I can to ensure that this case is tried thoroughly within the bounds of the evidence and in accordance with my instructions. . . .

ASH:   Just for the sake of sort of ease of mind, your Honor, I don't intend on entering any of the waters that you made very clear you don't want entered.  So I've tailored my comments very close to your rulings.

(Tr. B 17-19).

(2d Cir. 1960)); *see Patterson v. Balsamico*, 440 F.3d at 119 ("because attorneys are given wide latitude in formulating their arguments to the jury, rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal") (internal quotations and brackets omitted). For this reason, "[n]ot every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted." *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d at 278. In examining the propriety of opening statements and closing statements, a court should review "the entire argument within the context of the court's rulings on objections, the jury charge, and any corrective measures applied by the trial court." *Datskow v. Teledyne Cont'l Motors Aircraft Prods., a Div. of Teledyne Indus.*, 826 F. Supp. at 686 (internal quotations omitted); *see Malmsteen v. Berdon, LLP*, 595 F. Supp. 2d 299, 309 (S.D.N.Y. 2009) ("a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself"), *aff'd*, 369 F. App'x 248 (2d Cir. 2010) (summary order).

As an initial matter, I do not agree that all of the statements plaintiffs cite were improper, nor do I agree that those that were prejudiced plaintiffs to a degree to impede his right to a fair trial. For instance, plaintiffs maintain that Ash mischaracterized the testimony of defense experts Molinari and Benedict during his summation. (Docket # 170 at ¶¶ 380, 382). Contrary to plaintiffs' suggestion, however, Molinari did testify that he did not identify any evidence that Warr suffered any acute trauma injuries during the arrest and Benedict testified that he had detected exaggeration and was unable to exclude secondary gain factors during his

evaluation of Warr.  (Tr. A 429-30, 463-64, 472, 483, 485, 489).  Further, although Ash's

statement that Warr "can't stop getting arrested" (Docket # 170 at ¶ 382) was improper, evidence

that Warr had been arrested multiple times before May 1, 2013, was permissibly admitted in

accordance with the Court's *in limine* ruling.  Finally, as to that comment, Burkwit objected, and

the Court sustained the objection.

In any event, of the many statements plaintiffs now challenge, only a handful of

them were actually objected to at the time, and the Court sustained those objections.  (*Id.* at

¶¶ 299, 301, 302, 314, 315, 318, 371, 382).  The remaining statements went unchallenged during

the trial.  (*Id.* at ¶¶ 298, 304, 306, 309-13, 317, 367, 369, 373-81, 383).  In fact, during Ash's

summation, plaintiffs' counsel objected only twice.  (Tr. B 49, 54).  On each occasion, the Court

sustained the objection and instructed the jury to disregard the improper comment.  (*Id.*).  "When

the complaining party fails to object at trial to statements made during summation, the court will

only grant a new trial when the error is so serious and flagrant that it goes to the very integrity of

the trial."  *Malmsteen v. Berdon, LLP*, 595 F. Supp. 2d at 309 (internal quotations omitted).

Although it is certainly possible that Burkwit may have "declined from objecting further for

strategic purposes, the absence of a contemporaneous objection requires the [c]ourt to find

flagrant abuse before granting a new trial."  *Claudio v. Mattituck-Cutchogue Union Free Sch.

Dist.*, 955 F. Supp. 2d at 156 (internal quotations omitted); *see also Datskow*, 826 F. Supp. at 687

("[a] principle that strikes very deep is that a new trial will not be granted on grounds not called

to the court's attention during the trial unless the error was so fundamental that gross injustice

would result") (quotations omitted).

Moreover, I carefully instructed the jury both at the beginning of the trial and

again after the close of proof that an attorney's statements and questions are not evidence.  (Tr. A

14, 19, 527, 1458). Further, after the conclusion of Ash's summation, I identified several

statements in the summation, including his statements about plaintiffs' failure to introduce into

evidence certain deposition testimony and Levine's expert report, that required curative

instructions, despite the absence of objections by plaintiffs. (Tr. B 57-62). Despite their failure

to object at the time, plaintiffs now maintain that they are entitled to a new trial based in part on

those statements. (Docket # 170 at ¶¶ 373, 377). Specifically, although not noted by plaintiffs in

their post-trial submission, the Court instructed the jury as follows:

> There was a comment or discussion about Mr. Burkwit reading in
> certain deposition testimony and what the jury should understand
> is that there are evidentiary rules which permit some testimony to
> come in, some prior testimony like deposition testimony, and there
> are rules which preclude other testimony from being offered.
> Testimony of a party opponent may be offered. A party
> representative may be offered. But generally speaking, prior
> deposition testimony of a witness is not permitted to come in under
> the rules of evidence.
>
> With respect to a comment concerning the reason why Mr.
> Burkwit may not have offered Mr. Levine's report, what you
> should understand, again, is that there are rules that govern the
> admission of certain evidence and you shouldn't speculate or draw
> any conclusions about why Mr. Burkwit chose to offer Mr.
> Levine's opinion in one form as opposed to another.

(Tr. A 62-63). My instructions to the jury, both before and after Ash addressed them in

summation, ameliorated the potential prejudice arising from Ash's statements. *See Patterson*,

440 F.3d at 119 ("[c]onsidered in light of the district court's instruction, given to the jurors

immediately upon their return to the courtroom, the statements by [counsel] did not create

sufficient 'undue prejudice or passion' to warrant a new trial") (quoting *Matthews v. CTI*

*Container Transp. Int'l, Inc.*, 871 F.2d at 278); *Manlapig v. Jupiter*, 2016 WL 4617305, *2

(S.D.N.Y. 2016) ("any prejudice from defense counsel's 'inflammatory' statements was

mitigated by the [c]ourt's instructions to the jurors that they should base their decisions on the

evidence alone, and not on any statement made by an attorney"); *Claudio*, 955 F. Supp. 2d at 159

("given the [c]ourt's repeated actions to stop such misconduct, admonish counsel, and provide

curative instructions to the jury, counsel's behavior here cannot be said to have infected the trial

with undue prejudice or passion as to require reversal") (internal quotations and brackets

omitted); *Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457, 472 (S.D.N.Y. 2003)

("[the court's] instructions, in combination with the [c]ourt's directives during the summation of

plaintiff's counsel, likely cured the prejudicial effect of the frequent, but relatively minor

misconduct of plaintiff's counsel").

       The statements to which plaintiffs belatedly object primarily involved improper

bolstering by counsel, appeals to sympathy for the defendants, or disparagement of some of

plaintiffs' witnesses.  (Docket # 170 at ¶¶ 298, 304, 306, 309-13, 317, 369, 373-81, 383).  The

complained-of statements were not of a nature, particularly viewed in the context of the

eleven-day trial and my repeated curative instructions, to be considered "so inflammatory or so

unsupported by the record as to affect the integrity of the trial."  *Malmsteen*, 595 F. Supp. 2d at

310 (quoting *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 126-27 (2d Cir. 2005)).  Rather,

although Ash's "statements may have been on shaky [or even erroneous] evidentiary footing, or

were otherwise overzealous," *see id.*, in my estimation, they do not warrant a new trial, whether

considered individually or in combination.  *See Graham v. City of New York*, 128 F. Supp. 3d

681, 704 (E.D.N.Y. 2015) ("[h]aving seen the trial, observed the witnesses and counsel, and the

demeanor of both counsel and the jury, the [c]ourt cannot conclude that [p]laintiff's and his

counsel's statements and conduct had adversely impacted the defendants and affected the

outcome of the trial") (internal quotations and brackets omitted); *Claudio*, 955 F. Supp. 2d at 160

("having observed the witnesses, jury, and counsel throughout the course of this case, and having

considered the [c]ourt's various warnings, curative instructions, and consultations with defense counsel to confirm if she wanted further relief, the [c]ourt concludes that defendant was not deprived of a fair trial"); *Okraynets*, 555 F. Supp. 2d at 429 ("[w]hen viewed under the totality of the circumstances, and in the context of the trial as a whole, it is clear that the alleged attorney misconduct in this case did not create such prejudice with the jury so as to warrant a new trial") (internal citation omitted).

Nor do I find that the cases relied upon by plaintiffs counsel a different result. Those cases involved conduct different in both nature and magnitude, warranting a contrary result. *See Fineman v. Armstrong World Indus.*, 980 F.2d 171, 207-210 (3d Cir. 1992) (theme of summation involved attacks on opposing counsel primarily through "vituperative references to opposing counsel"), *cert. denied*, 507 U.S. 921 (1993); *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d at 539-40 (counsel improperly inserted regional biases into his summation, encouraging the jury to engage in an "us-against-them" calculus); *Draper v. Airco, Inc.*, 580 F.2d 91, 95-96 (3d Cir. 1978) (counsel's summation consisted of multiple improprieties including "repeated inappropriate references to the defendants' wealth," insertion of counsel's "personal opinion of the justness of his client's cause," counsel's prejudicial references "to facts not in evidence," and "several prejudicial, vituperative and insulting references to opposing counsel"); *Hopson v. Riverbay Corp.*, 190 F.R.D. 114, 122 (S.D.N.Y. 1999) (acts of misconduct included several misrepresentations of facts and misstatements of law). Further, contrary to this case, in *Pappas,* counsel's improper conduct went unchecked by sustained objections or curative instructions from the court. *See Pappas*, 963 F.2d at 540 ("[t]he combination of the overruled objection, the absence of a curative instruction, and the giving of only the standard jury charge regarding arguments of counsel could only have left the jury with the impression that they might properly

be influenced by the improper argument in rendering their verdict") (internal quotations and brackets omitted).

## III. <u>Sanctions</u>

Finally, I turn to the issue of sanctions. Plaintiffs seek sanctions pursuant to 28 U.S.C. § 1927 and this Court's inherent powers based upon Ash's misconduct during the trial, and the Court has notified defendants that it will consider *sua sponte* whether sanctions are warranted pursuant to Rule 16 for violations of its *in limine* rulings. (Docket ## 170-18 at 19-25; 172). The sanctions sought by plaintiffs primarily relate to any retrial ordered, as well as monetary sanctions for plaintiffs' costs and fees incurred as a result of Ash's misconduct. (Docket # 170-18 at 23-24 (seeking disqualification of Ash and costs that would be replicated as a result of a retrial)).

As an initial matter, any requested sanctions relating to a retrial of this matter are moot given the Court's ruling that a new trial is not warranted. Accordingly, the focus of the Court's analysis is on the other monetary sanctions requested – plaintiffs' costs and fees associated with the misconduct. The basis for the requested sanctions is precisely the same misconduct for which plaintiffs sought a new trial – Ash's repeated violations of this Court's *in limine* rulings, as well as his inflammatory comments throughout the trial. (*Id.* at 19-25). Because I conclude that the sanctions requested are warranted as a result of the former, I do not address whether Ash's inflammatory comments constitute an independent basis for sanctions. *See Ferguson v. Valero Energy Corp.*, 2010 WL 2164493, *8 (E.D. Pa. 2010) (limiting sanctions determination concerning counsel's trial misconduct to alleged violations of the court's "orders and rulings"), *aff'd*, 454 F. App'x 109 (3d Cir. 2011). Finally, regarding the authority pursuant

to which sanctions should be assessed, I conclude that Ash's failure to comply with the *in limine* rulings is most appropriately addressed under Rule 16(f). *See Hollybrook Cottonseed Processing, LLC v. Carver, Inc.*, 2012 WL 12929817, *17 (W.D. La. 2012) (analyzing compliance with *in limine* orders under Rule 16(f)) (collecting cases); *Estate of Shaw v. Marcus*, 2017 WL 825317, *5 (S.D.N.Y. 2017) ("'when there is . . . conduct in the course of litigation that could be adequately sanctioned under the Federal Rules of Civil Procedure or a specific statute, the court ordinarily should rely on the Rules rather than the inherent power'") (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) (brackets omitted)).

Rule 16(f) requires compliance with any "scheduling or other pretrial order" and authorizes a court to order sanctions against "a party or its attorney" for failure to comply. *See* Fed. R. Civ. P. 16(f). Parties and their attorneys have an uncompromising duty to comply with court orders, which "are not suggestions or recommendations, [but] are directives with which compliance is mandatory," *U.S. Bank N.A. v. SFR Invs. Pool 1, LLC*, 2018 WL 701816, *3 (D. Nev. 2018) (quotations omitted), and the purpose of Rule 16(f) is to "encourage forceful judicial management." *Sherman v. United States*, 801 F.2d 1133, 1135 (9th Cir. 1986) (*per curiam*).

"[V]iolations of Rule 16 are neither technical nor trivial, but involve a matter most critical to the court itself: management of its docket and the avoidance of unnecessary delays in the administration of its cases." *Martin Family Trust v. Heco/Nostalgia Enters.*, 186 F.R.D. 601, 603 (E.D. Cal. 1999) (internal quotation omitted). In managing the trial of this matter, this Court had "a serious duty to perform as the gatekeeper of evidence." *Warger v. Shauers*, 2010 WL 3701325, *11 (D.S.D. 2010). Of course, one of the court's most effective tools to fulfill this gatekeeping function is its authority to make *in limine* rulings regarding the

admissibility or inadmissibility of evidence.  The importance of compliance with the Court's

*in limine* orders is underscored by the applicability of sanctions even in the absence of

intentional, willful, repeated, or bad faith conduct; indeed, an unexcused failure to comply with a

court order is all that is required.  *See In re Baker*, 744 F.2d 1438, 1440 (10th Cir. 1984)

("neither contumacious attitude nor chronic failure is a necessary threshold to the imposition of

sanctions") (quotations omitted), *cert. denied*, 471 U.S. 1014 (1985); *Hollybrook Cottonseed

Processing, LLC v. Carver, Inc.*, 2012 WL 12929817 at *18 ("for purposes of Rule 16(f), the

question of whether [counsel] acted in bad faith is irrelevant to the analysis of whether sanctions

should be imposed against him at all"); *Mahoney v. Yamaha Motor Corp. U.S.A.*, 290 F.R.D.

363, 368 (E.D.N.Y. 2013) ("this [c]ourt does not need to find that a party acted in bad faith[,] . . .

[r]ather, the fact that a party violated a pretrial order is sufficient to allow a Rule 16 sanction");

*Barkouras v. Hecker*, 2007 WL 777664, *5 (D.N.J. 2007) ("[u]nder Rule 16, a party's failure to

comply . . . does not have to be purposeful or done in bad faith; unexcused failure to comply may

result in sanctions on the violating party").

      "The purpose of [Rule 16] sanctions is three-fold: (1) to ensure that a party will

not benefit from its own failure to comply; (2) to obtain compliance with the particular order

issued; and (3) to serve as a general deterrent effect on the case and on other litigants as well."

*Martinez v. New York City Health & Hosps. Corp.*, 2017 WL 6729296, *3 (S.D.N.Y. 2017)

(quotations omitted).  Where a court has determined that a violation of Rule 16(f) has occurred

and that sanctions are warranted, "it has broad discretion in fashioning an appropriate sanction."

*U.S. Bank N.A. v. SFR Invs. Pool 1, LLC*, 2018 WL 701816 at *4.  Indeed, the language of Rule

16(f) provides that the court may issue "any just order."  Fed. R. Civ. P. 16(f); *see also Duval v.

U.S. Xpress Enters., Inc.*, 2005 WL 6021864, *3 (N.D.N.Y. 2005) ("[Rule 16(f)] authorizes a full

range of sanctions . . . and confers broad discretion on a court to fashion a remedy appropriate to the violation"). Rule 16(f) also requires the Court to order the payment of reasonable expenses, including attorney's fees, incurred as a result of a violation of the rule unless the violating party can demonstrate that his or her "noncompliance was substantially justified or other circumstances make an award of expenses unjust." *Estate of Shaw v. Marcus*, 2017 WL 825317 at *4.

Although this Court took great pains to fulfill its gatekeeping role, through extensive oral argument, an evidentiary hearing, verbal and written rulings (some of which were articulated repeatedly), preliminary, limiting, curative, and closing instructions to the jury, and repeated cautions and admonishments to counsel, its efforts were repeatedly thwarted by Ash's trial conduct. As even he acknowledges (Docket # 174), Ash's repeated violations of this Court's *in limine* rulings are clear from the transcript, are highlighted *supra*, and need not be repeated here.

Ash now attempts to cast his violations as the unintentional and inadvertent, but understandable, result of the challenge of this two-week jury trial. (*Id.*). Ash's attempt to so construe the record minimizes his recklessness with respect to my *in limine* orders and underscores his failure to appreciate his own responsibility to comply with this Court's determinations and admonishments. Ash's recklessness is well-demonstrated by his explanation for his repeated use of Exhibit 19, despite the Court's previous sustained objection to the exhibit. After his second display of the exhibit, in response to the Court's admonishment, Ash explained, "This is the second time Mr. Burkwit[] [has] objected to this and I'm not sure what he's objecting to." (Tr. A 726). According to Ash, his comment demonstrates the inadvertent nature of his conduct by showing that he "was oblivious to the offending . . . section of the note."

46

(Docket # 171-1 at 6). At best, it demonstrates that Ash knowingly and carelessly redisplayed an objectionable exhibit to the jury without first attempting to determine why it was objectionable or why the Court had ordered him not to display it to the jury (indeed, the Court had advised him at the time of the first violation that the record should have been redacted (Tr. A 682)). *See Ferguson v. Valero Energy Corp.*, 454 F. App'x 109, 113 (3d Cir. 2011) ("[counsel] would have us believe that these repeated breaches of the [trial court's] orders were all a misunderstanding[;] . . . "[a]ny confusion on [counsel's] part should have been resolved following the first sidebar and chambers conference[,] [b]ut [counsel] continued to flout the [c]ourt's orders even after these admonitions").

Indeed, Ash's explanations and responses to the Court's repeated admonishments and the pending sanctions motion reveal Ash's strong disagreement with the Court's rulings; while disagreement is certainly permissible, flouting the rulings and then seeking refuge in that disagreement is not. For instance, Ash maintains that he did not believe that his "generalized question [to Kuttner] about the connection between jail and psychological trauma" would violate the Court's orders, and he argued vociferously in response to the Court's admonishment in an attempt to relitigate the *in limine* ruling. (Tr. A 764-68). Indeed, these same arguments are repeated in response to the pending motion. (Docket # 171-1 at 7-10). After Ash's examination of Kuttner, the Court provided explicit instructions that Ash was not to question witnesses about Warr's incarcerations; remarkably, he asked the very next witness about Warr's previous incarcerations. (Tr. A 813). Similarly, despite the Court's clear ruling regarding Warr's pre-arrest conduct, Ash intentionally waded into that very subject on three separate occasions, twice during his opening statement and once during his cross-examination of Warr. *See Hollybrook Cottonseed Processing, LLC*, 2012 WL 12929817 at *18 ("[t]he [c]ourt's in [l]imine

47

[o]rder [excluding offers of settlement] was a definitive pretrial ruling; [counsel] violated this [o]rder by intentionally seeking testimony from [a witness] regarding [an] offer of settlement"); *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 455 (S.D.N.Y. 2011) ("[the] orders were explicit and there is no suggestion that [counsel] misread or misunderstood them").

   This record demonstrates that Ash, an intelligent and experienced attorney, was exceptionally irresponsible, if not flippant, regarding his duty to comply with the Court's rulings, as demonstrated by his inexplicable use of an unmarked version of the blue light video. Given the extensive argument and *in limine* rulings regarding this issue, my explicit direction that the parties confer and agree to a single exhibit containing the relevant footage, and Ash's own representations on the record that he was using Plaintiffs' Exhibit 2 (Tr. A 1151), Ash's display of inadmissible footage to the jury is inexcusable and sanctionable. While Ash contends that the display was a mistake, he nonetheless argues that the door had been opened to the display (Docket # 171-1 at 11-12), despite the Court's clear direction to him that he needed to obtain a court ruling in the event he believed that plaintiffs had opened the door to the admission of evidence otherwise precluded by the Court. *See Warger v. Shauers*, 2010 WL 3701325 at *10 ("[w]hether [counsel] agreed with the court's ruling is irrelevant[;] [counsel] had a duty as an officer of the court to comply with the court's ruling[;] . . . the court believes [counsel] was so intent on presenting [an opinion] to the jury that, in his zeal, he recklessly violated the court's *in limine* order and subsequent evidentiary rulings); *Leidel v. Ameripride Servs., Inc.*, 291 F. Supp. 2d 1241, 1253 (D. Kan. 2003) ("[t]his response demonstrates that defense counsel has not accepted responsibility for her flagrant violation of the [c]ourt's order").

   In sum, the record demonstrates repeated misconduct by Ash evidencing a reckless disregard for this Court's rulings. *Warger*, 2010 WL 3701325 at *11 ("[t]here is no

reasonable justification or excuse for [counsel's] lack of compliance with the court's *in limine* order[;] [f]urther, the court finds [counsel] recklessly disregarded his duty to the court – his conduct was rash, careless, and lacking in caution or consideration and [counsel] was indifferent to the consequences of his actions"); *Ferguson v. Valero Energy Corp.*, 2010 WL 2164493 at *8 ("there was no room for misunderstanding after the [c]ourt sustained the defendants' many objections, held several discussions with counsel at sidebar, explicitly instructed [counsel] to avoid certain topics . . . , and held an hourlong in-chambers conference discussing his behavior"). Given the record, I have little trouble determining that Ash's conduct was not substantially justified, thus warranting an award of fees and costs pursuant to Rule 16(f). *See Shanchun Yu v. Diguojiaoyu, Inc.*, 2019 WL 6174204, *6 (S.D.N.Y. 2019) (ordering reimbursement of the "fees and costs [plaintiffs] incurred as a result of [d]efendants' lapses"); *Martin v. Giordano*, 185 F. Supp. 3d 339, 364 (E.D.N.Y.) ("[f]ederal court litigation . . . is fast-paced and demanding[,] [r]equir[ing] discipline and rigor from the attorneys and forceful management from the court[;] [w]ere this court to accept the myriad excuses proffered by [counsel] for their repeated violations of court orders, it would render Rule 16(f) practically meaningless), *reconsideration denied by*, 2016 WL 4411401 (E.D.N.Y. 2016); *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d at 456 ("[t]o remedy the injury to [d]efendants, as required by Rule 16, [counsel] must pay to [d]efendants the costs, including attorneys' fees, they expended"). Accordingly, Ash is ordered to reimburse those fees and costs incurred by plaintiffs' counsel in researching, preparing and filing plaintiffs' post-trial submissions in this matter, including the costs of ordering the transcript, but excluding the opposition to Liberatore's motion for qualified immunity. In the event that counsel are unable to stipulate to the amount owed, plaintiffs' counsel shall submit an affidavit attesting to

those fees and costs with supporting documentation by no later than **April 20, 2020**. Ash may respond by no later than **May 11, 2020**.

I further find that an additional monetary sanction payable to the Clerk of the Court is warranted pursuant to Rule 16 for Ash's repeated violations of this Court's rulings, which were both carefully reasoned and articulated at length both prior to and during the trial. As demonstrated by the transcript, Ash's conduct necessitated repeated intervention by the Court, including admonishments and curative instructions, as well as protracted post-trial motion practice. Given the recklessness of the conduct, defendants' counsel shall pay $500 to the Clerk of the Court within thirty (30) days of the entry of this Decision and Order. *See Grenion v. Farmers Ins. Exch.*, 2014 WL 1284635, *8-10 (E.D.N.Y. 2014) (awarding opposing party reasonable expenses incurred as a result of the noncompliance and ordering additional monetary sanctions payable to the Clerk of the Court; "[b]ecause Rule 16(f) authorizes the [c]ourt to issue 'any just orders,' the notion of an additional monetary sanction, payable to the Clerk of the Court, provides an obvious alternative [sanction]").

## CONCLUSION

For the reasons stated above, the Court denies plaintiffs' motion for a new trial and to set aside the verdict and grants in part their motion for sanctions. (Docket ## 158, 170).

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
March 30, 2020